ACCEPTED
07-15-00113-CV
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
6/1/2015 8:01:39 PM
Vivian Long, Clerk

_____

In The

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
6/1/2015 8:01:39 PM
VIVIAN LONG
CLERK

# Seventh District Court of Appeals

———————————————

No. 07-15-00113-CV

———————————————

MOHAMMED FAWWAZ SHOUKFEH, M.D.,
P.A., D/B/A TEXAS CARDIAC CENTER,
APPELLANT

v.

JAMES G. GRATTAN AND TEXAS WORKFORCE COMMISSION,
APPELLEES

_____

## APPELLANT'S BRIEF ON THE MERITS

_____

**CRAIG, TERRILL, HALE & GRANTHAM, LLP**
**H. GRADY TERRILL**
**ELIZABETH G. HILL**
Texas Bar No. 24083179
9816 Slide Rd, Suite 201
Lubbock, Texas 79424
806/744-3232
Facsimile 806/744-2211
ehill@cthglawfirm.com

## ORAL ARGUMENT REQUESTED

## ISSUES PRESENTED

I.     Did the Texas Workforce Commission fail to enforce the plain language of Grattan's agreement when it failed to conclude that the agreement was ambiguous in order to consider evidence outside the written agreement between the parties?

II.    Was the Texas Workforce Commission's decision arbitrary, unreasonable and without regard to the law when it imposed duties on Texas Cardiac Center in violation of the Texas Labor Code and voided another employee's compensation agreement?

## IDENTITIES OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.1(a), Appellants certify that the following is a complete list of the parties, the attorneys, and any other person who has any interest in the outcome of this lawsuit:

Plaintiff/Appellant:                                       Mohammed Fawwaz Shoukfeh, M.D. P.A., d/b/a Texas Cardiac Center

Attorneys for Plaintiff/Appellant:       H. Grady Terrill
Elizabeth G. Hill
Craig, Terrill, Hale & Grantham, LLP
9816 Slide Road, Suite 201
Lubbock, Texas 79424

Defendant/Appellee:                                 James G. Grattan

Attorneys for Defendant/Appellee:      John H. Simpson
Splaw Simpson Pitts
P.O. Box 1376
Lubbock, TX 79408-1376

Defendant/Appellee:                                 Texas Workforce Commission

Attorneys for Defendant/Appellee:      Peter Laurie
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL...............................................................i

TABLE OF CONTENTS.................................................................................. iii

INDEX OF AUTHORITIES................................................................................v

ISSUES PRESENTED...................................................................................... ii

I.      Did the Texas Workforce Commission misconstrue the contract's plain language when it accepted Grattan's argument that certain expenses should not be deducted, even though the plain language of the contract provided for the deductions?.........................................................................................ii

II.     Was the Texas Workforce Commission's determination arbitrary and unreasonable when it imposed duties on Texas Cardiac Center that are in violation of the Texas Labor Code and voided another employee's compensation agreement? ........................................................................ii

STATEMENT OF THE CASE............................................................................1

STATEMENT REGARDING ORAL ARGUMENT...................................................1

STATEMENT OF FACTS ................................................................................2

SUMMARY OF THE ARGUMENT.....................................................................4

ARGUMENT ...............................................................................................8

I.  This Court should find that the Texas Workforce Commission misconstrued the contractual agreement between the parties because it accepted Grattan's analysis of an unambiguous provision. .............................................8

A. The agreement is unambiguous and therefore, the TWC—as well as the district court—erred in considering parol evidence.................... 10

B.  The Texas Workforce Commission, as well as the district court, failed to determine that the contract was ambiguous and therefore, committed an error of law....................................................... 17

II.  This Court should find that the Texas Workforce Commission's determination was arbitrary and unreasonable because it imposed unwritten and illegal duties on Texas Cardiac Center. ..................................20

A.  The Texas Workforce Commission imposed duties on Texas Cardiac Center that are in direct violation of the Texas Labor Code......................21

B.  The Texas Workforce Commission reached its conclusion by looking to the title of the employee rather than the nature of the employee's compensation agreement .......................................................23

PRAYER ...........................................................................................................25

APPENDICES....................................................................................................28

# INDEX OF AUTHORITIES

## Cases

*Ayres Welding Co. v. Conoco, Inc.*, 243 S.W.3d 177
(Tex. App.—Houston [14th Dist.] 2007, pet. denied) ............................8,9

*Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738
(Tex. 1998)........................................................................................9, 14

*Calpine Producer Servs., L.P. v. Wiser Oil Co.*, 169 S.W.3d 783
(Tex. App.—Dallas 2005, no pet.)..................................................17

*Cities of Abilene v. Pub. Util. Comm'n of Tex.*, 146 S.W.3d 742
(Tex. App.—Austin 2004, no pet.)...................................................14, 17

*City of El Paso v. Pub. Util. Comm'n of Tex.*, 344 S.W.3d 609
(Tex. App.—Austin 2011, no pet.)...................................................8, 12

*Coker v. Coker*, 650 S.W.2d 391
(Tex. 1983) ....................................................................................8

*Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587
(Tex. 1996) .....................................................................................9, 15

*Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669
(Tex. App.—Austin 2003, no pet.)..................................................8

*City of Houston v. Morris,* 23 S.W.3d 505
(Tex. App.—Houston [1st Dist.] 2000, no pet.) ..............................7

*Heritage on San Gabriel Homeowners Ass'n v. Tex. Comm'n on Envtl. Quality*,
393 S.W.3d 417 (Tex. App.—Austin 2012, pet. denied).................11,20

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*,
907 S.W.2d 517(Tex. 1995)............................................................17, 18

*Starr Co. v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352
(Tex. App.—Austin 1979, writ ref'd n.r.e.).....................................20

*State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430
    (Tex. 1995).........................................................................................14

**Statutes**

Texas Labor Code § 61.018 .......................................................... *passim*

## STATEMENT OF THE CASE

This case arises pursuant to a wage claim filed by Appellee, James Grattan, with the Appellee, Texas Workforce Commission (TWC) (Claim No. 13-055631-0). *See* CR 340-53. The initial determination order was issued by TWC on August 14, 2013, wherein Appellant, Texas Cardiac Center, was ordered to pay Grattan wages of $38,435.89; both parties appealed. *See* CR 348. After an appeal, the Wage Claim Appeal Tribunal issued an order on October 7, 2013 wherein Texas Cardiac was ordered to pay Grattan the wages of $5,817.32; both parties appealed. *See* CR 340-47. Finally, TWC issued Findings and Decisions of Commission Upon Review of Claim for Wages on February 06, 2014, wherein Texas Cardiac was ordered to pay Claimant the wages of $125,988.91. *See* CR 351-53. Pursuant to Tex. Labor Code § 61.062, the administrative remedies were exhausted and Texas Cardiac petitioned for a trial de novo from the 99th District Court in Lubbock County pursuant to § 61.062 (e) on February 28, 2014. *See* CR 6-10. All parties filed cross motions for summary judgment. The Court issued its final judgment on March 2, 2015, granting the motions for summary judgment of the Appellees and denying the motion for summary judgment of the Appellant. *See* CR 426. Texas Cardiac timely filed this appeal of the trial court's ruling on March 31, 2015. *See* CR 428-29.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would be beneficial to the Court in this case because the issues presented concern complex legal analysis of both the standard of review, as well as the interplay between contract law and statutory mandates.

## STATEMENT OF FACTS

James Grattan was a physician with Texas Cardiac Center ("Texas Cardiac") from June 19, 2006 through April 30, 2013. *See* CR 262-64; 273. At the onset of Grattan's agreement to become a physician with Texas Cardiac, Grattan entered into a Physician Employment Agreement providing for the written authorization to deduct expenses for shared overhead of Texas Cardiac. *See* CR 262-64. The Agreement specifies a formula in Section 1(E) that outlines how earnings will be calculated. *See* CR 263. Grattan was paid the net results of his gross receipts less his pro rata share with other physicians of Texas Cardiac who had also contractually agreed in writing to the deductions. *See* CR 260-61. This "eat what you kill" concept is highly common in physician groups and the deductions are authorized pursuant to Texas Labor Code § 61.018. *See* CR 260-61.

In 2012, one of the four physicians that were subject to the deductions resigned, leaving only three physicians to share in the overhead expenses. *See* CR 260-61. Texas Cardiac hired a new employee, Dr. Qaddour, a new physician who

was not yet licensed in Texas and did not have staff privileges at the local hospitals. *See* Ex. CR 260-61. Qaddour's employment with Texas Cardiac resembled that of a nurse or office staff member who was not yet income producing and would gradually increase his duties and salary until he became an expense-sharing physician after two years of employment. *See* CR 189-96. Qaddour did not provide written authorization for the deductions to allow Texas Cardiac to deduct the overhead expenses pursuant to the Texas Labor Code. *See* CR 191. Although notice was given to Grattan regarding the meeting to discuss these issues, Grattan did not attend or express his opinion regarding the offer to Qaddour; therefore, the Board of Texas Cardiac approved the hire of Qaddour as an employee that would allow a stair-step transition period while he was obtaining licenses and privileges to practice. *See* CR 260-61; 189-96.

Throughout his employment, Grattan received detailed calculations of his pay—calculated pursuant to the above formula. *See* CR 260-61. The portion of time in dispute between the parties includes the pay for the months of September 2012 through April of 2013. *See* CR 260-61. In January of 2013, Grattan provided notice of his intent to depart his employment with Texas Cardiac. *See* CR 273. During that time, Grattan continued to receive compensation pursuant to the agreement between the parties. *See* CR 260-61. Following his final departure in April of 2013, Texas Cardiac sent Grattan his final paycheck in the

3

amount of $32,014.66 (amounts calculated from September 2012 until April 2013), the amount calculated pursuant to the above formula minus required deductions, such as income tax and social security. *See* CR 265-73.

Grattan filed this wage claim in complaint that Texas Cardiac had not deducted the overhead expenses from Qaddour, even though neither Qaddour's agreement nor the Texas Labor Code authorized such deductions. *See* Parts I and II; Tex. Lab. Code § 61.018. Grattan argued that because Texas Cardiac had required all practicing physicians to contribute to the overhead deductions in the past, that Texas Cardiac was always required to do so, even though not contractually or statutorily authorized to against Qaddour. Nonetheless, the final TWC committee agreed with Grattan and determined that Texas Cardiac Center must divide the overhead expenses between four physicians, including Qaddour, even though Texas Cardiac had no contractual or statutory authorization to do so. *See* CR 351-53.

## SUMMARY OF THE ARGUMENT

The entire crux of the dispute between the parties focuses on what deductions were authorized by Grattan as his pro rata share as dictated in his agreement with Texas Cardiac. The question is: Who should be subject to the "pro rata" share of the deduction of overhead expenses? Grattan urged—and the Texas Workforce Commission (TWC) accepted—the argument that because

4

Qaddour was a "practicing physician," Qaddour should consequently, be subject to the pro rata deduction requirements because this was the past "compensation practice" of Texas Cardiac. Yet, neither the agreement between Grattan and Texas Cardiac nor the agreement between Qaddour and Texas Cardiac provided for such a presumption. Most importantly, the Texas Labor Code *prohibits* an employer, such as Texas Cardiac, from deducting expenses without written authorization, or some other legal authorization, such as a court order.

Yet, the TWC required just that: ordering that Texas Cardiac must divide the overhead expenses with a new physician who had not provided written authorization as required by the Texas Labor Code. Further, without determining that Grattan's agreement was ambiguous, the TWC looked outside the agreement to reach its conclusion in violation of traditional principles of contract law. Further, the TWC failed to consider Qaddour's contractual arrangement, as well as the character of his employment with Texas Cardiac, more akin to that of a nurse or staff member, especially in the first six months. This determination violated the Texas Labor Code, as well as general principles of contract law.

In fact, the only division authorized contractually, or statutorily by the Texas Labor Code, was a division between the physicians who had *contractually agreed in writing* to the deduction of overhead expenses. This was the only

conclusion that the TWC could have come to that would be consistent with the law. Rather than determining that a new employee who never provided written authorization for the deductions should be forced to share in the overhead expenses, the TWC should have looked to the plain language of both agreements, as well as the requirements under the Texas Labor Code, which dictate written authorization prior to such deductions. Because the TWC's decision was arbitrary, unreasonable, and without regard to the law, this Court should reverse the district court's ruling affirming the TWC's decision and remand for further proceedings.

## STANDARD OF REVIEW

The various standards of review potentially applicable to this case warrant considerable discussion. As a preliminary matter, this Court is aware that it reviews de novo whether a district court applied the correct legal standard and granted summary judgment affirming an agency decision. *See Heritage on San Gabriel Homeowners Ass'n v. Tex. Comm'n on Envtl. Quality*, 393 S.W.3d 417, 423 (Tex. App.—Austin 2012, pet. denied). Further, while courts provide certain deference to administrative agency decisions, courts still review the agency's legal conclusions for errors of law, while reviewing its factual findings for support by substantial evidence. *See id.* ("In other words, we must remand for arbitrariness if we conclude that the agency has not 'genuinely engaged in reasoned decision-making.'"). While

courts should provide considerable deference to an agency's decisions involving factual determinations, there is *no* presumption of validity to be afforded an agency's interpretation of a contract. *See City of El Paso v. Pub. Util. Comm'n of Tex.*, 344 S.W.3d 609, 619 (Tex. App.—Austin 2011, no pet.) ("[A]n administrative interpretation of the contract is *not entitled* to a presumption of validity.") (emphasis added). Likewise, in contrast to the interpretation of a statute or rule—in which courts give deference to an agency's interpretation due to its rulemaking authority and expertise concerning its policies—interpretation of private parties' agreements are not given such statutory-like deference. *See id.*

Further, courts must remand for arbitrariness if it concludes that the agency has not "genuinely engaged in reasoned decision-making." *See id.* Courts should review not only whether there was substantial evidence to support the decision, but also whether the correct legal standard was applied to reach that decision. *City of Houston v. Morris,* 23 S.W.3d 505, 508 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (stating that if the TWC acted "without regard to the law or the facts," the denial was "unreasonable, arbitrary, or capricious" and subject to reversal).

## ARGUMENT

**I. This Court should find that the Texas Workforce Commission misconstrued the contractual agreement between the parties because it accepted Grattan's interpretation of an unambiguous provision and ignored a valid contractual agreement with Qaddour.**

When interpreting contractual language, courts should seek to give full effect to the plain language of the contract as the best expression of the intent of the parties. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument."). When a contract can be given a definite interpretation, then the contract is not ambiguous and will be interpreted as a matter of law. *See id.*; *see also City of El Paso*, 344 S.W.3d at 619 ("If a contract is unambiguous—i.e., it can be given a definite or certain legal meaning—an administrative interpretation of the contract is not entitled to a presumption of validity."). Simply claiming that a provision could be interpreted differently does not amount to an ambiguity. *See Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676 (Tex. App.—Austin 2003, no pet.); *Ayres Welding Co. v. Conoco, Inc.*, 243 S.W.3d 177, 182 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("Ambiguity in a contract does not exist merely because the parties assert forceful and diametrically opposing interpretations, but only if the contract language is susceptible to two or more *reasonable* interpretations.") (emphasis in original). Even when a contract

8

could include more specific language, this alone does not create an ambiguity when the court can ascertain the reasonable interpretation of the language. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 591 (Tex. 1996) ("The failure to include more express language of the parties' intent does not create an ambiguity when only one reasonable interpretation exists."). If a party's urged interpretation would require the court to ignore the plain language of the contract, the interpretation is unreasonable and must be rejected. *See Ayres Welding Co.*, 243 S.W.3d at 182.

Further, courts should strive to maintain consistency throughout a written agreement and not construe any single portion in a manner that would conflict with general rules of contract construction and would result in an absurd and nonsensical result. *See Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 740-41 (Tex. 1998) ("We must read all parts of the contract together, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative.") citing *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). To that end, courts should strive to give full effect to the parties' chosen language. *See Balandran*, 972 S.W.2d at 741 ("Our primary goal, therefore, is to give effect to the written expression of the parties' intent.").

**A. The agreement is unambiguous and therefore, the TWC—as well as the district court—erred in considering parol evidence.**

Here, Grattan's employment agreement provides for the deduction of expenses pursuant to a clearly enunciated formula. *See* CR 206-08. Grattan's urged interpretation, which the TWC adopted, ignores the plain language of the agreement entered between the parties. The pertinent portion of Grattan's agreement provides:

> E. The following terms shall apply beginning June 19, 2006. Physician will be responsible for his own malpractice and health insurance, life/disability insurance expenses, communication (i.e., cell phone, pager, etc.) expenses, and other non-cardiac related expenses ***as well as a pro rata share of the overhead expenses incurred by Association (including, without limitation, overhead incurred by Association during periods in which Physician may be ill and therefore, absent from Association)***; and (ii) Physician will receive Physician's Net Receipts collected by Association ***less Physician's pro rata share of the overhead expenses***. "Physician's Net Receipts" means the net amount collected by Association for services personally performed by Physician, ***less contractual and other adjustments***, and shall exclude all Designated Health Services Revenues. "Designated Health Services Revenues" are defined as the net collections of Association for the professional and technical components of the following ancillary tests: echocardiograms, Doppler tests, chest x-rays and any other ancillary services that are deemed to be designated health services under the Stark Law (Social Security Act §1877 and as published at Fed. 70 Reg. 70116 (Nov. 21, 2005) and as amended thereafter). The revenues from designated Health Services Revenues will be distributed to shareholders in accordance with a formula based on revenues from the previous year.

*See* CR 262-64 (emphasis added). Essentially, the agreement dictated a formula to determine Grattan's pay:

10

*Physician's Net Receipts*

*plus*

*Designated Health Services Revenues*

*minus*

*Contractually Agreed Deduction of Overhead Expenses*

Although the practice had typically employed four physicians, during times of transition, three physicians divided the overhead expenses. *See* 260-61. In 2012, one of the physicians left the practice, leaving only three physicians, including Grattan and Shoukfah, to share in the expenses of the practice. *See* CR. In January 2013, Texas Cardiac hired a new employee, Dr. Qaddour, an unlicensed doctor that was in the process of both obtaining a license to practice medicine in Texas and obtaining privileges at area hospitals. *See* CR 189-96. Qaddour was unable to begin practice in earnest until his license and privileges were granted. *See* CR 189-96. Qaddour's employment agreement specifically referenced a lower salary and limited responsibilities during the time he was not yet granted privileges at the area hospitals, including and up to two years after his initial employment. *See* CR 189-96. As a result, Qaddour was hired as an employee, with a different agreement with Texas Cardiac than Grattan, and treated similar to a nurse or office staff member until he began generating income. *See* CR 189-96; 340-47.

Yet, Grattan urged that because Qaddour was technically a "physician" (even if he was not licensed to yet practice in Texas) that Qaddour should also

11

share in the division of expenses from the first day he began working for Texas Cardiac. *See* CR 351-53. Texas Cardiac, however, contracted with Qaddour under a different arrangement because without privileges and, consequently, practice income, Qaddour was not yet able to generate income to cover the pro rata division of overhead expenses. *See* CR 189-96 (agreement with Qaddour contemplating his eventual completion of privileges). No written authorization to deduct expenses was obtained from Qaddour, as required under the Texas Labor Code § 60.018. *See* CR 189-96. The TWC adopted this position even though nothing within Grattan's agreement set forth a mandated requirement that any employee who was also a physician *must* share in the pro rata expenses. *See* CR 262-64. The consequence of the TWC interpretation would literally mean that While true that courts should provide considerable deference to an agency's decisions involving factual determinations, there is *no* presumption of validity to be afforded an agency's interpretation of a contract. *See City of El Paso*, 344 S.W.3d at 619 ("[A]n administrative interpretation of the contract is not entitled to a presumption of validity."). Further, in contrast to the interpretation of a statue or rule—in which courts give deference to an agency's interpretation due to its rulemaking authority and expertise concerning its policies, interpretation of private parties' agreements are not given such statutory-like deference. *See id.*

Nothing within Grattan's employment contract provided for a guaranteed number of physicians and even past conduct between the parties revealed that often times, only three physicians shared in the pro rata division. *See* CR 260-61. And, considering the different hiring and compensation agreement with Qaddour, no reasonable interpretation of Grattan's contract could support his insisted division in violation of the agreement with Qaddour, and consequently, in violation of the Texas Labor Code. *See* Part II; Tex. Lab. Code § 61.018. In fact, looking to the plain language of the contract, Grattan was required, himself, to "practice medicine in Association's office(s), as well as in area hospitals required by Association." *See* CR 206. In contrast, Qaddour's contract contemplated a substantially lower salary until Qaddour obtained his privileges. *See* CR 189-96. Further, Grattan was required to "maintain medical staff membership and appropriate clinical privileges in good standing at the Lubbock Heart Hospital, Covenant Health System, and such other area hospitals as required by Association." *See* CR 206. In return, Grattan received a percentage of the "Designated Health Service Revenue" pursuant to his contract—something Qaddour would not receive at all for his first two years. *See* CR 206.

Even so, prior to determining that a provision or portion of a contract is unambiguous, the court (or in this case, agency) must first seek to determine whether the contract can be interpreted pursuant to the plain language. *See*

13

*Balandran*, 972 S.W.2d at 740-41 ("We must read all parts of the contract together, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative.") citing *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). Prior to considering parol evidence, the agency should first determine that the contract is ambiguous. *See Cities of Abilene v. Pub. Util. Comm'n of Tex.*, 146 S.W.3d 742, 750 (Tex. App.—Austin 2004, no pet.).

Yet, the TWC accepted Grattan's unilateral assertion that Qaddour should be treated as a fully practicing physician from the moment he began working at Texas Cardiac (without a written agreement to deduct expenses as required under the Texas Labor Code). In looking to the contract's plain language, including the requirements placed on Grattan, the TWC should have reached a plain language interpretation that determined that Qaddour was not yet on the same level as Grattan (and the other practicing physicians) and had not agreed to the authorized deduction of expenses during the time of his transition of the first two years. In fact, in contrast to Grattan's agreement with Texas Cardiac, Qaddour did not receive a percentage of the "Designated Health Service Revenue" which would certainly aid a fully practicing physician in covering the shared overhead expenses. *See* CR 262-64.

To be sure, simply because the agreement does not further provide specific references to a transition time for unlicensed physicians, this alone does

14

not create an ambiguity that would allow the Court—or TWC—to look outside the parties' agreement. *See Columbia Gas Transmission Corp.*, 940 S.W.2d at 591 ("The failure to include more express language of the parties' intent does not create an ambiguity when only one reasonable interpretation exists."). Here, Qaddour was not a practicing, fully licensed physician and under an analysis of the plain language of Grattan's agreement, Qaddour was not on the same playing field as Grattan. Yet, the final TWC committee (two of the three committee members) arbitrarily accepted Grattan's urged and unreasonable interpretation—which finds no basis or support within the agreement's plain language and is in direct violation of the requirements of the Texas Labor Code. *See Ayres Welding Co.*, 243 S.W.3d at 182 (finding that an interpretation is unreasonable when it ignores the plain language of the agreement between the parties); *see also* Texas Labor Code § 61.018 & Part II. Essentially, Grattan urged and the TWC's final committee adopted this position that looks outside— and conflicts—with the plain language of the contract which provides that Grattan would receive additional and better compensation than Qaddour. Even considering Grattan's complaint that his income was substantially less the final months of his employment is explained by the decrease in his revenue. *See* CR 265-73 (averaging approximately $97,000 in gross revenue for the months of September – December 2012 as compared to approximately $79,000 in gross

15

revenue for the months of January – April 2013). *See* CR 265-73. And, Grattan's claim that overhead expenses increased dramatically during the final months of his employment are unfounded as well. *See* CR 265-73 (averaging total overhead expenses of approximately $185,000 for the months of September – December 2012 as compared to approximately $190,000 for the months of January – April 2013).

The practical effect of this interpretation is highlighted by the apparent effect on Qaddour this interpretation would create. Essentially, Qaddour, without a license or privileges to practice and without providing written authorization, would be expected to incur and payout the shared expenses of the physician group, even though he initially had little to no revenue because he was not yet licensed or privileged to practice. This interpretation violates both contractual principles, as well as the Texas Labor Code's requirement that employees provide written authorization before deductions. *See* Tex. Lab. Code § 61.018. And, because he was not receiving certain revenue and limited to 45 percent of his collections, Qaddour's salary compensation was significantly less advantageous than Grattan. *Compare* CR 262-64 with CR 189-96.

Consequently, the TWC decision reflects a fundamental error of law because it failed to construe the agreement by its plain terms or consistent with other provisions within the same agreement. But, importantly, it is impossible to

16

even determine how the TWC reached its decision, which considered parol evidence, because it failed to determine that the contract's language was ambiguous.

### B. The Texas Workforce Commission, as well as the district court, failed to determine that the contract was ambiguous and therefore, committed an error of law.

Before reaching the conclusion that outside evidence should be considered to construe the parties' agreement, a court, or agency, must first find that the contract itself is ambiguous. *See Cities of Abilene*, 146 S.W.3d at 750. The ultimate concern in construing a contract is to ascertain the true intent of the parties. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Courts should examine an unambiguous contract as a whole, harmonizing all provisions and looking only to the written contract. *See Calpine Producer Servs., L.P. v. Wiser Oil Co.*, 169 S.W.3d 783, 787 (Tex. App.—Dallas 2005, no pet.) (describing this approach as the "Four Corners Rule"). When the contract reveals itself as ambiguous, however, the court may consider the parties' interpretations of the contract and examine extraneous evidence to determine the true meaning of the instrument. *See Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520. The determination of whether a contract is ambiguous is a question of law. *See id.* And in making that determination, a court may construe the contract in light of the surrounding circumstances at the time the contract was drafted. *See Balandran*, 972

S.W.2d at 741. If when viewed through the lens of those circumstances, the contract's meaning appears uncertain or doubtful, then the language is necessarily susceptible to more than one meaning. *See id.*

An ambiguity may be patent—evident on the face of the contract—or latent—only ambiguous when applied to the subject matter with which it deals by reason of some collateral matter. *See Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520 n.4 ("For example, if a contract called for goods to be delivered to 'the green house on Pecan Street,' and there were in fact two green houses on the street, it would be latently ambiguous."). The court may consider parol evidence only when the ambiguity at issue is latent. *Id.* Once the court reaches the determination that a contract's language proves ambiguous, the court may look to parol evidence to decipher the parties' intent. *Id.*

Here, however, there is nothing within the record to show that the TWC actually engaged in any analysis to reach the conclusion that the contract was ambiguous. In fact, the contrast between the extent of the opinions issued by the prior agency decision maker, Sue Dennis, highlights the lack of analysis and consequently, arbitrary results. *See* CR 15 (actually analyzing the language of Grattan's agreement). This is further buttressed by the starkly different results that the prior two agency decision makers reached. *See* CR 11-20. The final TWC committee simply stated the following: "According to the compensation

practice and agreement between the parties, the expenses of the business were divided between all practicing doctors." *See* CR 24. Yet, this interpretation is not actually supported by either the agreement or the actual facts. But, nonetheless, the TWC must have first reached the conclusion that the agreement was ambiguous to even consider parol evidence.

But here, the TWC engaged in apparently no analysis that the agreement was ambiguous and would allow the consideration of parol evidence. The TWC's opinion simply states that the "Commission does not agree with the Wage Claim Tribunal's conclusion that the employer had the right to change the pay agreement between the parties." *See* CR 24. Then, the TWC goes on to claim that "[a]ccording to the compensation practice and agreement between the parties, the expenses of the business were divided between all the practicing doctors." *See* CR 24. Yet, nothing within Grattan's agreement states this presumption and Grattan's agreement does not include the term, "all practicing doctors," as those that would be sharing in the pro rata expenses. *See* CR 262-64. The TWC clearly considered parol evidence without identifying any provision within the agreement as ambiguous. *See* CR 351-53. Consequently, the TWC committed errors of law when it heavily considered evidence outside the four corners of the agreement in construing the parties' contractual commitments without first determining that the agreement was ambiguous.

19

Therefore, this Court should reverse the District Court's decision affirming the TWC's determination.

   II.    **This Court should find that the Texas Workforce Commission's determination was arbitrary and unreasonable because it imposed unwritten and illegal duties on Texas Cardiac Center.**

Even when courts have found that substantial evidence supports an agency's decision, courts must still reverse and remand when the decision is unreasonable or reached without a reasoned basis under the law. *See Starr Co. v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 355 (Tex. App.—Austin 1979, writ ref'd n.r.e.) *citing Lewis v. Metropolitan Savings & Loan Ass'n*, 550 S.W.2d 11, 16 (Tex. 1966) ("There the Court made it clear that an order may be supported by substantial evidence and yet be invalid for arbitrariness."); *Heritage on San Gabriel Homeowners Ass'n*, 393 S.W.3d at 423 ("In other words, we must remand for arbitrariness if we conclude that the agency has not 'genuinely engaged in reasoned decision-making.'"). The unreasonable nature of the TWC's determination is best characterized by practically observing its effect: that Texas Cardiac must deduct overhead expenses to Qaddour—without a written agreement to do so as required under the Texas Labor Code—and could never employ a physician without charging the overhead expenses to that physician. *Nothing* within Grattan's agreement required Texas Cardiac to only employ physicians that would contribute to the overhead expenses and *nothing* required Texas Cardiac

20

to include "all practicing physicians" within the calculations of the formula. *See* CR 262-64. In fact, as further discussed below, the TWC decision is in direct violation of the Texas Labor Code. Further, the TWC's decision virtually voided another employee's agreement who was not party to the wage claim and presumed that the fourth doctor *must* share in the expenses, even though he was not contractually obligated to do so—a violation of Texas law. Because the TWC engaged in abrupt and arbitrary decision making—without regard to the legal analysis as to whether the contract was ambiguous and without regard to the other employee's nature of compensation and employment, this Court should reverse because the TWC acted unreasonably, arbitrarily, and without regard to the law.

### A. The Texas Workforce Commission imposed duties on Texas Cardiac Center that are in direct violation of the Texas Labor Code.

As specifically addressed in the Texas Payday Law, an employer may only withhold or divert employee's wages under certain exceptions, including written authorization from the employee. *See* Tex. Lab. Code 61.018. Yet, instead of determining that the pro rata share would be shared between those physicians that had agreed contractually to the overhead deductions—pursuant to the Payday Law—that "all practicing physicians" should share. *See* CR 351-53. In fact, there is no evidence within the TWC record that the final committee even considered the fact that the Payday Law would apply equally to Qaddour

21

and requires deductions only if contractually agreed to, or otherwise authorized by law. *See* CR 351-53. In contrast, the TWC made the determination, essentially, that Qaddour should also share in the expenses because "this is how it had always been done." *See* CR 351-53.

Yet, this very presumption is in direct violation of Texas law itself—by the agency charged with its enforcement. *See* Tex. Lab. Code 61.018. The Texas Payday Law provides:

> An employer may not withhold or divert any part of an employee's wages unless the employer:
> (1)    is ordered to do so by a court of competent jurisdiction;
> (2)    is authorized to do so by state or federal law; or
> (3)    has *written authorization* from the employee to deduct part of the wages for a lawful purpose.

*See* Tex. Lab. Code § 61.018 (emphasis added). Texas Cardiac obtained written authorization from Grattan in the original employment agreement, pursuant to the third exception under the Labor Code. *See* CR 262-64. Any other physician who would be required to share in the pro rata arrangement must *also* agree in writing for the deduction pursuant to Texas law. But, *incredibly*, the final TWC committee did not even contemplate this critically important legal requirement placed on Texas Cardiac through its order—that Texas Cardiac would violate the Texas Labor Code as to Qaddour if it followed the TWC's order.

In fact, the only way that Texas Cardiac could have required Qaddour to share in the overhead expenses was to enter a contractual agreement with

22

Qaddour in writing to that effect. But, somehow, the TWC committee expected Texas Cardiac to impose the pro rata share on "all practicing physicians" regardless of the statutory requirement of a written agreement, because that was the "compensation practice" in the physician's group. Although the TWC actually cited the correct statute, it failed to consider that this statute would apply to Qaddour as well. *See* CR 351-53. This unexplained and arbitrary determination is in direct violation of the Texas Labor Code and consequently arbitrary, unreasonable and essentially, illegal.

Further, there was absolutely nothing within Grattan's agreement that required Texas Cardiac to only employ a physician if the physician agreed to share in the overhead expenses. The reasoning that "it had always been done this way" simply does not muster any reasonableness to essentially disregard both the written agreement between the parties and the Texas statutory requirement that any employer obtain written consent prior to withholding deductions from wages. As a result, the TWC decision is in direct violation of the Texas Labor Code because it imposes an obligation on Texas Cardiac to withhold deduction from an employee who had not agreed to do so in writing.

**B. The Texas Workforce Commission reached its conclusion by looking to the title of the employee rather than the nature of the employee's employment agreement.**

In support of its formula of compensation of Qaddour, Texas Cardiac

provided the TWC with a copy of Qaddour's agreement. *See* CR 189-196. Qaddour agreed to considerably less compensation over the course of the first two years of practice with Texas Cardiac than Grattan or the other Texas Cardiac physicians. *See* CR 191 (providing that Qaddour would only receive 45 percent of his collections with an advanced salary to be deducted "against Physician's collections"). Qaddour's compensation was starkly contrasted from Grattan, who received 100 percent of his net collections. *See* CR 189-96.

Both of the lower agency decisions considered it unreasonable to force Texas Cardiac to saddle Qaddour with the division of expenses—in violation of Qaddour's employment agreement—when his engagement with Texas Cardiac was most similar to that of a nurse or office staff member. *See* CR 15 ("Dr. Shoukfeh introduced Dr. Qaddour as a new employee, but not an associate. . . Dr. Qaddour was hired as a salaried employee, and was not held responsible for any portion of the overhead of the practice. . .").

A comparison could best be illustrated by considering a law firm that included partners only—each compensated in an "eat what you kill" arrangement. The TWC's decision would arbitrarily prevent that law firm from ever hiring an associate right out of law school—without a license to practice or without holding any admissions to nearby courts. Because otherwise, the new associate (in the process of obtaining a law license) must share in the overhead

expenses in a similar manner as the rest of the attorneys (simply because that associate was technically an "attorney" once licensed). Such an interpretation is nothing short of an arbitrary and capricious decision, arbitrarily overruling the contractual arrangement between Texas Cardiac and Qaddour. Simply finding concern because Grattan's salary decreased does not give rise to agency authority to rewrite both his *and* Qaddour's compensation agreements, in violation of the Texas Labor Code.

Further, Grattan failed to attend the called meeting to discuss the hiring of Qaddour. *See* CR 340-47. Grattan had full opportunity to participate and at least become aware of the compensation arrangement with Qaddour. Yet, later Grattan complained that he was unaware of the difference in Qaddour's compensation. The TWC simply declared that "the fourth doctor was not included when splitting business expenses" and therefore Grattan "was underpaid." *See* CR 353. The TWC determined that because Qaddour was technically a "physician," he should also share in the expenses. *See* CR 351-53. On the contrary, the TWC did not hold the authority to re-write and ignore valid contractual agreements, as well as the Texas Labor Code, between Grattan and the Texas Cardiac, as well as Qaddour and Texas Cardiac. Consequently, the TWC decision was entirely unreasonable, arbitrary and capricious and carried out without regard to the law and the agreements between the parties. As a

result, this Court should reverse the District Court's ruling that affirmed the TWC's decision.

## PRAYER

The TWC issued findings and conclusions wherein Texas Cardiac was ordered to pay Grattan in a division of deductions that would violate both the Texas Labor Code, as well as traditional principles of contract law. The order required Texas Cardiac to deduct expenses to each of the practicing physicians, even though one of the practicing physicians, Qaddour, had not provided written authorization to do so as required under the Texas Labor Code § 61.018. Further, the TWC looked outside the written agreement between the parties without first determining that the agreement was ambiguous. Therefore, this Court should find that the TWC decision is arbitrary, unreasonable and without regard to the law. This Court should reverse the judgment of the district court and remand for further proceedings consistent with its decision.

Respectfully submitted,

*/s/ Elizabeth G. Hill*
ELIZABETH G. HILL
State Bar No. 24083179
CRAIG, TERRILL, HALE & GRANTHAM, LLP
9816 Slide Rd., Suite 201
Lubbock, TX 79424
806/744-3232   806/744-2211 Facsimile
ehill@cthglawfirm.com

26

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent to the following counsel of record pursuant to the Tex. R. Civ. P. on this the 1st day of June, 2015:

John Simpson
Splaw Simpson Pitts
P.O. Box 1376
Lubbock, TX  79408-1376

Peter Laurie
Financial and Tax Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, TX  78711-2548

*/s/ Elizabeth G. Hill*

## CERTIFICATE OF COMPLIANCE

I certify that the word count in this Brief is 5,721.

*/s/ Elizabeth G. Hill*

27

# APPENDICES

APPENDIX 1 – FINAL ORDER OF THE DISTRICT COURT ................................... TAB 1

APPENDIX 2 – ORDERS OF THE TEXAS WORKFORCE COMMISSION ................. TAB 2

APPENDIX 3 – GRATTAN AGREEMENT ............................................................ TAB 3

APPENDIX 4 – QADDOUR AGREEMENT ........................................................... TAB 4

APPENDIX 5 – WILLS AFFIDAVIT ................................................................... TAB 5

APPENDIX 6 – REVENUE CALCULATIONS ........................................................ TAB 6

APPENDIX 7 – TEXAS LABOR CODE § 61.018 .................................................. TAB 7

# TAB 1

TB

No. 2014-510,479

| | | |
|---|---|---|
| MOHAMMED FAWWAZ SHOUKFEH, MD PA, d/b/a TEXAS CARDIAC CENTER | § § § | IN THE 99ᵗʰ DISTRICT COURT |
| *Plaintiff,* | § § | |
| v. | § § | OF |
| JAMES G. GRATTAN TEXAS WORKFORCE COMMISSION | § § § | |
| *Defendants* | § | LUBBOCK COUNTY, TEXAS |

## FINAL JUDGMENT

After considering the Motions for Summary Judgment of James G. Grattan and the Texas Workforce Commission, the pleadings, any response, the affidavits, and other evidence on file, the Court GRANTS the Motions for Summary Judgment of James G. Grattan and the Texas Workforce Commission. The Motion for Summary Judgment of Plaintiff is DENIED.

The Court finds that there is substantial evidence to support the Texas Workforce Commission's PAYDAY LAW (wage claim) decision and that judgment should be entered as to that decision.

It is therefore, ORDERED, ADJUDGED AND DECREED that the Texas Workforce Commission PAYDAY LAW benefits decision pursuant to Chapter 61, Texas Labor Code in favor of James G. Grattan is affirmed.

426

This order is final and appealable and disposes of all parties and all claims. All attorneys' fees and costs of court incurred in this cause shall be borne by the party incurring same. All other relief not expressly granted herein is denied.

SIGNED on this 2nd day of March, 2015

_____
William Sowder, Judge Presiding

# TAB 2

FILE COPY
DETERMINATION CODES:   CO45   E141

# TEXAS WORKFORCE COMMISSION

## PRELIMINARY WAGE DETERMINATION ORDER
Labor Law
August 14, 2013          PAGE  1 OF 1 PAGES

CLAIMANT                                      EMPLOYER


JAMES G GRATTAN                    MOHAMMED FAWWAZ SHOUKFEH, M.D., P.A.
                                  DBA TEXAS CARDIAC CENTER
                                  3710 21ST ST
   Ident #:                       LUBBOCK TX  79410-1220
                    Wg Clm #:13 055631-0  Det #:000476197

MOHAMMED FAWWAZ SHOUKFEH, M.D., P.A.
DBA TEXAS CARDIAC CENTER

An investigation having been completed, the following order is entered pursuant
to Chapter 61 of the Texas Labor Code:


### FINDINGS AND CONCLUSIONS

The claimant is entitled to  __$38,435.89_ for unpaid _wages_____.
Based on the employer's policy/agreement and/or the claimant's performance
records, the claimant is entitled to the determined amount.

It has been determined that the employer violated the provisions of the Texas
Payday Law when the claimant's earned wages were not paid in accordance with
the law. If it is determined that an employer has acted in bad faith, the
Commission may assess an administrative penalty for failure to pay wages as
required by law. In this case no penalty is assessed.


### ORDER

The employer,
MOHAMMED FAWWAZ SHOUKFEH, M.D., P.A. _____
_____,
is ORDERED to pay ___$38,435.89_ for the use and benefit of the claimant,
JAMES G GRATTAN _____, and shall remit the gross or net
amount disbursement payable to the Texas Workforce Commission.

In addition, being found in violation of Chapter 61 of the Texas Labor Code,
the employer is assessed an administrative penalty in the amount of ___$0.00_
which is to be remitted to the Texas Workforce Commission.

Assigned Investigator:   SMITH




Pursuant to the Texas Tax Code, section 171.255, if the corporate privileges of a corporation or
other taxable entity subject to the franchise tax are forfeited by the Texas Comptroller, each officer
or director of the taxable entity is liable for any debt of the entity during the period of forfeiture.

(SEE REVERSE SIDE FOR ADDITIONAL INFORMATION)

LL-25A (0310)

TWC 000097
JAMES GRATTAN 00095

335

## APPEALS

You have the right to appeal this determination order. Your appeal must be in writing. It must be filed no later than 21 days from the date this determination order was mailed in order to preserve administrative appeal rights. If you fax your appeal TWC must receive it no later than 21 days from the date the determination was mailed. TWC will use the date we receive the fax to determine whether your appeal is timely. If you file your appeal by fax, you should retain your fax confirmation as proof of transmission. If neither party files a timely appeal, this determination order becomes the FINAL ORDER of the Commission. Appeals should be mailed or faxed to:

Special Hearings
Texas Workforce Commission
101 East 15th Street
Austin, Texas 78778-0001
Fax#: 512-463-9318

Or

You may appeal by
TWC's online appeal form
Go to www.texasworkforce.org

## ADMINISTRATIVE LIEN

Sec. 61.081 of the Labor Code provides that "A final order of the Commission against an employer indebted to the state for penalties or wages, unless timely appealed to a court, is a lien on all property belonging to the employer. The lien for an unpaid debt attaches at the time the order of the Commission becomes final."

## PAYMENTS

An employer who requests a hearing to contest this determination should not send payment. Should your appeal decision affirm that wages are due, follow the payment instructions provided with the appeal decision.

An employer who does not request a hearing to contest the determination order shall pay the amount ordered to the Commission not later than the 21st day after the date of mailing of the order. An employer shall make a net payment amount (balance after valid deductions that are authorized by state or federal law, and by court orders; such as but not limited to federal income tax witholding, social security, and child support) payable to the Texas Workforce Commission. Payment to the Commission constitutes payment to the employee for all purposes. To ensure proper processing please return the enclosed remittance slip, and deduction documentation with payment. You may contact the Commission for clarification on valid deductions.

## PENALTY

If the Commission determines that an employer acted in bad faith in not paying wages as required by this chapter, the Commission, in addition to ordering the payment of wages, may assess an administrative penalty against the employer.

If the Commission determines that an employee acted in bad faith in bringing a wage claim, the Commission may assess an administrative penalty against the employee.

## BOND

The Commission may require an employer to deposit a bond if the employer is convicted of two violations of this chapter or a final order of the Commission against an employer for nonpayment of wages remains unsatisfied after the 10th day after the date on which the time to appeal from that final order has expired and an appeal is not pending.

**Please provide the Labor Law Section written notification of any change in your address.**

Texas Workforce Commission
Labor Law Section
101 East 15th Street
Austin, Texas 78778-0001
1-800 832-WAGE (9243) -- Fax#: 512-936-3364

LL-25A-BK (0613)

POSAR

TWC 000098

JAMES GRATTAN 00096

336

STATE OF TEXAS

**TEXAS WORKFORCE COMMISSION**
**Labor Law Dept.**
**101 East 15th Street**
**Austin, Texas 78778-0001**

FILE COPY



H. GRADY TERRILL
FIRST BANK CENTER
9816 SLIDE RD. SUITE 201
LUBBOCK TX  79424

DETERMINATION NBR:     000476197
WAGE CLAIM NBR:        13 055631-0

LL250 (0194)

TWC 000099
JAMES GRATTAN: 00097

**TEXAS WORKFORCE COMMISSION**
**WAGE CLAIM APPEAL TRIBUNAL**
101 East 15th Street
Austin, Texas 78778

_____October 7, 2013_____
Date Mailed

## TEXAS PAYDAY LAW DECISION

CLAIMANT

JAMES G GRATTAN

<span style="background:black">          </span>

EMPLOYER

MOHAMMED FAWWAZ SHOUKFEH MD PA
DBA TEXAS CARDIAC CENTER
3710 21ST ST
LUBBOCK TX 79410-1220

**NOTICE:**
The attached decision will become final **fourteen (14)** calendar days after the date mailed shown above, unless within that time a party to the appeal files a written request for reopening or a written appeal to the Commission.* Please see the attached copy of appeal rights for further information regarding reopenings or appeals to the Commission.

APPEAL NO.: 13-055631-0

WAGE CLAIM DATE: May 16, 2013

BUSINESS ENTITY: Texas Professional Association

APPEAL FILED BY: Employer
APPEAL FILED BY: Claimant

DATE APPEAL FILED: August 27, 2013
DATE APPEAL FILED: August 28, 2013

DATE OF HEARING: October 1, 2013

PLACE OF HEARING: Telephone

APPEARANCES:

Hearing, October 1, 2013; Telephone

For Claimant: James G. Grattan
    *Observer:* John Simpson, Attorney

For Employer: Grady Terrill, Attorney
                Shirley Willis, CPA

Exhibits: 6

CC:

H GRADY TERRILL
FIRST BANK CENTER
9816 SLIDE RD STE 201
LUBBOCK TX 79424

*Note: If the last date for filing a motion for reopening or an appeal falls on a Texas state or federal holiday, the time for filing the request is extended to the next working day.

**TEXAS WORKFORCE COMMISSION**
**WAGE CLAIM APPEAL TRIBUNAL**
101 East 15th Street
Austin, Texas 78778

October 7, 2013
Date Mailed

**TEXAS PAYDAY LAW DECISION**

EMPLOYER                                          CLAIMANT

MOHAMMED GAWWAZ SHOUKFEH MD PA          JAMES G GRATTAN
  DBA TEXAS CARDIAC CENTER
3710 21ST ST
LUBBOCK TX 79410-1220

**NOTICE:**
The attached decision will become final **fourteen (14)** calendar days after the date mailed shown above, unless within that time a party to the appeal files a written request for reopening or a written appeal to the Commission.* Please see the attached copy of appeal rights for further information regarding reopenings or appeals to the Commission.

APPEAL NO.: 13-055631-0                WAGE CLAIM DATE: May 16, 2013

BUSINESS ENTITY: Texas Professional Association

APPEAL FILED BY: Employer              DATE APPEAL FILED: August 27, 2013
APPEAL FILED BY: Claimant              DATE APPEAL FILED: August 28, 2013

DATE OF HEARING: October 1, 2013       PLACE OF HEARING: Telephone

**APPEARANCES:**

Hearing, October 1, 2013; Telephone

For Claimant:  James G. Grattan
    *Observer:*  John Simpson, Attorney

For Employer:  Grady Terrill, Attorney
    Shirley Willis, CPA

Exhibits: 6

CC:

H GRADY TERRILL
FIRST BANK CENTER
9816 SLIDE RD  STE 201
LUBBOCK TX 79424

*Note: If the last date for filing a motion for reopening or an appeal falls on a Texas state or federal holiday, the time for filing the request is extended to the next working day.*

TWC 000022

JAMES GRATTAN 00020

340

TEXAS WORKFORCE COMMISSION

APPEAL NO. 13-055631-0
PAGE NO. 2

**CASE HISTORY:** By a determination order issued August 14, 2013, pursuant to the Texas Payday Law, Labor Code, Chapter 61, section 61.052, the employer, MOHAMMED FAWWAZ SHOUKFEH MD PA, DBA TEXAS CARDIAC CENTER, was ordered to pay to the Texas Workforce Commission for the benefit of the claimant, JAMES G GRATTAN, the amount of $38,435.89. Both the employer and claimant appealed.

**FINDINGS OF FACT:** The claimant filed a wage claim with the Texas Workforce Commission on May 16, 2013, alleging that the employer failed to pay the claimant as prescribed by the Texas Payday Law. Specifically, the claimant asserted that he was not paid all wages earned from September 1, 2012 to April 30, 2013. Wages were payable 60 to 90 days following the close of the month in which they were earned.

The claimant worked as an associate physician (cardiologist), from June 19, 2006 to April 30, 2013, for the employer, MOHAMMED FAWWAZ SHOUKFEH MD PA, a Texas professional association, doing business under the name TEXAS CARDIAC CENTER. The claimant earned wages based on formula dependent on his patient load. Wages and expenses were calculated for each month. They were to be paid at the end of the second month following the month in which service was provided. (September earnings would be paid at the end of November). When he was paid, the standard federal deductions were taken from his earnings. The employer would also deduct incidental personal expenses as covered by the association. The claimant did not protest these deductions.

When the claimant was hired in June 2006, he and Dr. Fawwaz executed an Agreement Proposal. The agreement was not amended during the claimant's association with the practice. The claimant was identified as an employee/partner. A partnership agreement was not formulated. In January 2013, due to the lack of a partnership agreement and other reasons, the claimant resigned, giving 90 days' notice.

The claimant did not contribute personal funds outside of his stated earnings from the practice to pay overhead or operational costs of the offices and practice. The claimant did not contribute real or personal property to the business. The claimant did not have the right to review the financial records of any other doctors within the practice. The claimant never purchased a single share in the Professional Association, but at some point was designated a 1% owner. A documentary record of the ownership interest was not provided to the claimant or to the Commission. The claimant had did not have a significant interest to effect the operation of the association. He had no right to control or direct the expenditures. He had no authority to hire and fire staff members.

The claimant did not share in the profits of the association. Amounts received were based on the receipts his services generated. However the claimant did share in the expenses of the practice. How the employer calculated his percentage of the expenses is the basis of his wage claim. At his separation, the claimant and other associates did not enter into the dissolution of a partnership.

In March 2013, the employer calculated the claimant's earnings for September 2012. This was the first tabulation of the claimant's earnings since September 2012 when August earnings were paid. Since the claimant had given his 90 day notice, the employer calculated all overhead expenses from September 2012 through February 2013, and deducted one third of the expenses from the claimant's one month of receipts. In doing so, the earnings were zeroed out. No check was issued to the claimant for September 2012. The claimant was not provided with an earnings statement showing his gross earnings for September, minus federal deductions and minus $8,616.47 as his overhead portion, leaving the claimant with net zero. The claimant had no knowledge that his wages earned for September 2012 had been accounted for when he filed his claim.

On September 1, 2012, one of the physicians, Dr. Wischmeyer, left the practice. A meeting was called by Dr. Shoukfeh to discuss the situation. The claimant was unable to attend. In the meeting, Dr. Shoukfeh announced his intention to hire a doctor. The claimant had previously advised Dr. Shoukfeh, that since there had been no discussion or decision regarding his request to consider partnership, this was not the time to bring in another physician.

TWC 000023

JAMES GRATTAN: 00021

341

TEXAS WORKFORCE COMMISSION

APPEAL NO. 13-055631-0
PAGE NO. 3

In the week following the meeting, Dr. Shoukfeh introduced Dr. Qaddour as a new employee, but not an associate. The new physician was hired in November 2012. Dr. Shoukfeh did not inform the claimant of how the hiring of a non-US resident, who was not at that time credentialed by the two hospitals served by the physicians of the association, would effect the claimant's earnings. The claimants hiring agreement was not altered. The claimant was not presented with a written agreement that would explain any special privileges provided to Dr. Qaddour. Each doctor that became affiliated with the professional association, signed a distinct work agreement, individualized to him. Dr. Qaddour was hired as a salaried employee, and was not held responsible for any portion of the overhead of the practice, as the claimant and the other two physicians in the association. It is noted that after his hire, the line item in the overhead expenses identified as medical support salary was not increased commensurate with Dr. Qaddour' s salary.

The new employee was credentialed to treat patients in the Lubbock Heart Hospital in January 2013, and may not have been credentialed at Covenant Medical Center until sometime later. Dr. Qaddour was not required to bear the burden of a share of the overhead costs while the claimant was employed and he was establishing himself in Lubbock medical community.

According to the Agreement Proposal executed June 19, 2006, and not altered or replaced by alternate work agreement, the section pertaining to compensation states:

> Physician will be responsible for his own malpractice and health insurance, life/disability insurance expenses, communication (i.e., cell phone, pager, etc.) expenses, and other non-cardiac related expenses, as well as a pro rata share of the overhead expenses insured by the Association.

This section also explained that the claimant's earnings would be paid in accordance with the following formula:

> Physician's Net Receipts collected by Association
> (paid for services personally rendered)
>
> + Designated Health Services Revenue collected by Association
> (paid for professional and technical tests)
>
> - Pro Rata share of overhead expenses
>
> = monthly earnings paid

The formula did not mention the non-cardiac expenses, which were defined in the first sentence of the paragraph. These expenses were deducted from the claimant's net earnings after overhead had been taken. The claimant signed the Agreement Proposal, indicating his agreement to all terms and conditions.

The claimant provided evidence to show that employer had historically divided the overhead expenses evenly between all physicians active in the practice within a month's period. Each physician held responsible for overhead costs had a hiring agreement requiring them to participate in covering the overhead expenses. In the past when leniency was offered to Dr. Wischmeyer regarding the requirement to provide his share of the overhead expenses, all other doctors agreed to the action. When Dr. Qaddour was hired he was not required to pay any portion of the overhead expenses, as a salaried employee. The claimant was not consulted before this decision was made or advised of the decision before his termination.

Each month the claimant was to be issued an accounting sheet tabulating his earnings from medical services and tests ordered. The accounting also itemized the overhead costs of the association. A total overhead cost was

TEXAS WORKFORCE COMMISSION

APPEAL NO. 13-055631-0
PAGE NO. 4

calculated and his pro rata share was calculated. The claimant's personal expenses would then be itemized and deducted. The claimant's pre-tax wage amount would be printed in bold. The claimant did not receive his revenue sheets for September to April until after his separation.

In September and October the gross expenses were divided by three (Dr. Shoukfeh, Dr. Overlie and the claimant). After Dr. Qaddour was hired, the employer continued to divide the overhead expenses by three participants in the practice. The claimant asserted that this forced him to pay more than his pro rata share of the expenses.

In each but the April revenue sheet for the claimant, the expense of a personal employee, from $4,700 to as great as $4,953.84 was deducted from the claimant's earnings. This was his share of the cost of one nurse who assisted him and the other doctors. When he resigned, the nurse did also, moving with the claimant to a new practice. The employer attributed the funds issued to the nurse as accrued and unused benefit time, $12,334.84, to the claimant alone. Further evidence was not provided to determine the true cost of the benefit to the departing nurse. It is noted that the list of overhead expenses include medical support staff (approximately $40,000 to $45,000 per month), and for employee benefits.

The claimant also protested being charged overhead expenses for a research operation that he had no part of. The claimant asserted that the receipts from the research conducted were not deposited into the association. The employer asserted that if the claimant's patients had participated in the research active, revenue from the research would have been posted to the claimant's account. The research entity was managed by the association. The claimant had not protested the expenses for the research component of the association during his employment.

According to the tabulations of the employer:

| Month | Revenue | Total Overhead Expenses | Pro Rata Share (÷ 3) | Personal Expenses | Payable Earnings |
|---|---|---|---|---|---|
| September 2012 | $105,040.98 | $225,905.74 | $76,301.91 | $13,714.71 | $15,024.36 |
| October 2012 | $ 97,651.81 | $183,295.63 | $61,098.54 | $ 8,531.15 | $28,022.12 |
| November 2012 | $ 91,324.96 | $170,224.18 | $56,741.39 | $13,345.40 | $21,238.17 |
| December 2012 | $ 95,691.40 | $162,670.45 | $54,223.48 | $22,908.83 ★ | $18,559.09 |
| January 2013 | $ 65,972.96 | $165,661.17 | $55,220.39 | + $6,812.44 ★ | $17,565.01 |
| Jan. recalculated | $ 65,972.96 | $229,505.06 * | $76,501.68 | $29,498.69 ★ | -$40,027.41 |
| February 2013 | $ 87,289.79 | $162,587.38 | $54,195.79 | $24,708.66 | $ 8,385.34 |
| March 2013 | $ 72,767.50 | $175,995.18 | $58,665.06 | $23,324.73 | - $9,222.29 |
| April 2013 | $ 92,045.05 | $197,035.92 | $65,678.64 | $30,513.81 + | - $4,147.40 |

★ December figure includes $13.31 as personal expense discovered after tabulation or not attributable to another category. January figures include a $590.57 as a personal expense discovered after tabulation or not attributable to another category. The wages before taxes was not recalculated with the $590.57 deductions when the sheet was adjusted, but is considered above.
* The credit for an isotope reimbursement was removed.
+ Includes total costs of paid benefits to departing nurse.

Tabulating the payable earnings using the recalculated figures for January, the claimant would have been due $37,831.98. Note is taken that the investigator did not consider the extra expenses that were attributed to the claimant and handwritten on the revenue sheets. If the initial calculation for January is used, the claimant would be entitled to $95,424.40.

On May 20, a final disbursement was issued to the claimant in the amount of $32,014.66. This was net wages. Proof of the federal deductions taken was not provided. The earnings statement associated with the payment

TEXAS WORKFORCE COMMISSION

APPEAL NO. 13-055631-0
PAGE NO. 5

check, No. 6069, does not itemize the deductions taken. The employer asserted that the $6,421.23 difference between the ordered amount of $38,435.89 and the face value of the check, constitutes the federal deductions.

**CONCLUSIONS:** The claimant is entitled to $5,817.32 in gross unpaid wages from this employer under the Texas Payday Law.

### JURISDICTION – PARTNERSHIP

Section 61.001(3) of the Texas Payday Law states, in part, that employee means an individual who is employed by an employer for compensation.

Section 2.03 of the Texas Revised Partnership Act provides, in part, that factors indicating that persons have created a partnership include their

(1) receipt or right to receive a share of profits from the business,
(2) expression of an intent to be partners in the business,
(3) participation or right to participate in the control of the business,
(4) sharing or agreeing to share losses of the business or liability for claims by third parties against the business, and (5) contributing or agreeing to contribute money or property to the business.

A partnership is a distinct legal entity. A partner is a co-owner and not an employee of the entity. Therefore the Texas Payday Law would not apply to a controversy concerning a partner against the partnership.

When the claimant was hired as an associate, there was the potential that would become a partner in the future. However, he was not entitled to a share of the profits, although he was required to contribute to the expenses of the business. The claimant had no authority to make decisions for the association. The ultimate authority rested in the majority owner. As shown by the hiring of Dr. Qaddour, the claimant's reservations were not considered. The claimant had no knowledge that he was considered a 1% owner, until after the fact. The claimant did not share in the losses of the association. The claimant did not contribute real or personal property, including cash, with the exception of partial payment of the overhead. Therefore, although an eventual partnership was anticipated, this relationship was not formed. As proven by his separation, there was no termination of the Professional Association and wrapping up of a partnership.

The claimant was hired as an associate employee. Therefore his wage claim is covered by the Texas Payday Law.

### REGULAR WAGES

Section 61.001(7)(A) of the Texas Payday Law states that wages means compensation owed by an employer for labor or services rendered by an employee, whether computed on a time, task, piece, commission, or other basis.

The claimant was to be paid for his services as a cardiologist, and the tests that he ordered. However, the revenue he generated was subject to his contribution to the overhead and the deduction of his personal expenses. The employer calculated his earnings for each month's services.

The controversy in this claim is whether the overhead should have been divided equally between three physicians as was done by the employer, or by four physicians after the hiring of Dr. Qaddour. While the claimant remained employed, Dr. Qaddour was the only salaried employee. He was not paid based on the revenue he generated. The division of the cost of overhead was consistently between those doctors who were paid based on the revenue they generated, not a set salary. For several months, Dr. Qaddour's earning potential was restricted because he was not credentialed. Therefore Dr. Qaddour did not have the potential earning to be able to contribute to the overhead of the association. It was reasonable for the employer not to require Dr. Qaddour to contribute to the overhead. He was treated the same as a nurse or administrative staff member earning a salary. Therefore the Commission will not correct the employer's calculations and reduce the

TWC 000026

JAMES GRATTAN: 00024

344

TEXAS WORKFORCE COMMISSION

APPEAL NO. 13-055631-0
PAGE NO. 6

claimant's overhead deduction for November – April. The calculations presented by the employer, including the corrected January revenue sheet will be found to be accurate and authoritative.

Therefore when the claimant filed his wage claim, he was due $37,831.98 in earned and unpaid wages.

| Month | Revenue | Expense Share ($\div 3$) | Personal Expenses | Payable Earnings |
|---|---|---|---|---|
| September 2012 | $105,040.98 | $76,301.91 | $13,714.71 | $15,024.36 |
| October 2012 | $ 97,651.81 | $61,098.54 | $ 8,531.15 | $28,022.12 |
| November 2012 | $ 91,324.96 | $56,741.39 | $13,345.40 | $21,238.17 |
| December 2012 | $ 95,691.40 | $54,223.48 | $22,908.83 ★ | $18,559.09 |
| January 2013 | $ 65,972.96 | $76,501.68 | $29,498.69 | -$40,027.41 |
| February 2013 | $ 87,289.79 | $54,195.79 | $24,708.66 | $ 8,385.34 |
| March 2013 | $ 72,767.50 | $58,665.06 | $23,324.73 | - $9,222.29 |
| April 2013 | $ 92,045.05 | $65,678.64 | $30,513.81 | - $4,147.40 |
| Total | | | | $37,831.98 |

★ December figure includes $13.31 as personal expense discovered after tabulation or not attributable to another category. January figure includes $590.57 as a personal expense discovered after tabulation or not attributable to another category.

Following the filing of his claim the claimant was issued a check in the net amount of $32,014.66. The claimant negotiated the check after the determination order was issued. The employer failed to produce evidence to prove that this is the amount payable to the claimant after federal deductions. Therefore the determination will be modified to order the employer to pay $5,817.32 ($37,831.98 - $32,014.66).

If the employer provides proof of payment of the gross wages earned of at least $37,831.98, minus federal deductions of no more than $5,817.32, the amount due and payable to the claimant will be satisfied.

### REQUIRMENT TO PROVIDE EARNINGS STATEMENTS

Texas Labor Code 62.003 states:

EARNINGS STATEMENT. (a) At the end of each pay period, an employer shall give each employee a written earnings statement covering the pay period.

(b) An earnings statement must be signed by the employer or the employer's agent and must show:

(1) the name of the employee;

(2) the rate of pay;

(3) the total amount of pay earned by the employee during the pay period;

(4) any deduction made from the employee's pay and the purpose of the deduction;

(5) the amount of pay after all deductions are made; and

(6) the total number of:

(A) hours worked by the employee if the employee's pay is computed by the hour; or

(B) units produced by the employee during the pay period if the employee's pay is computed on a piece rate

(c) An earnings statement may be in any form determined by the employer. The information required by Subsection (b) may be stated on a check voucher or bank draft given to an employee for the employee's wages.

(d) In this section, "pay period" means the period that an employee works for which salary or wages are regularly paid under the employee's employment agreement.

Commission Rule 815.106 (40 TAC 815.106) reads, in part, as follows:

TEXAS WORKFORCE COMMISSION

APPEAL NO. 13-055631-0
PAGE NO. 7

(a) Each employing unit shall keep true and accurate employment and payroll records, that shall include the name and correct address of the employing unit, and the name and address of each branch or division or establishment operated, owned, or maintained by the employing unit at different locations in Texas, and the following information for each and every individual performing services for it:

    (1) the individual's name, address, and social security number;
    (2) the dates on which the individual performed services for the employing unit and the state or states in which the services were performed;
    (3) the amount of wages paid to the individual for each separate payroll period, date of payment of the wages, and amounts or remuneration paid to the individual for each separate payroll period other than "wages," as defined in the Act; and
    (4) whether, during any payroll period the individual worked less than full time, and if so, the hours and dates worked.

The employer failed to provide an earnings statement to the claimant at the time of the accounting of September wages was performed and with the final wages issued to the claimant. The employer is therefore in violation of the Texas Labor Code.

## AUTHORIZED DEDUCTIONS

Section 61.018 of the Texas Payday Law states that an employer may not withhold or divert any part of an employee's wages unless the employer: (1) is ordered to do so by a court of competent jurisdiction; (2) is authorized to do so by state or federal law; or (3) has written authorization from the employee to deduct part of the wages for a lawful purpose.

Commission Rule 821.28 (40 T.A.C. § 821.28) states, in part:

(a) The Commission provides the following guidance in determining whether an employer is entitled to withhold or divert wages under court order, by law or with written authorization under Section 61.018 of the Act:
    (1) A court is presumed to be a court of competent jurisdiction with respect to issuing court orders. The burden shall be on the party opposing a court order to challenge the court's authority by appealing to the issuing court or court of appropriate review as the Commission will presume full faith and credit applies to court orders.
    (2) State or federal law includes statutes and codes enacted by Congress or the Texas Legislature, rules promulgated by a Texas or federal agency, and regulations promulgated by a Texas or federal agency.
    (3) A lawful purpose is one that is authorized, sanctioned, or not forbidden, by law.

(b) Written authorization for deductions shall be specific as to the lawful purpose for which the employee has accepted the responsibility or liability. Written authorizations shall be:
    (1) sufficient to give the employee a reasonable expectation of the amount to be withheld from pay; and
    (2) a clear indication that the deduction is to be withheld from wages.

(c) If an employer uses a handbook, policy manual or other similar document instead of a separate writing, the employee's signed acknowledgment of receipt of company policies can be authorization to withhold wages if the acknowledgment meets the requirements of subsection (b) of this section and specifically informs the employee of the deduction. The signed acknowledgment of receipt shall also include language that states that the employee agrees to abide by or be bound to the authorization for deduction.

(d) The employer shall ensure that properly withheld wages are applied toward their authorized purpose. Properly withheld wages not applied toward their authorized purpose will be considered unlawful deductions.

(e) The employer shall obtain written authorization as required under the Act to deduct credit card service charges from an employee's tips.

TEXAS WORKFORCE COMMISSION

APPEAL NO. 13-055631-0
PAGE NO. 8

The standard federal deductions were taken from earnings according to federal law. The employer is not in violation of the Texas Payday Law for taking these deductions. However the employer must produce a record of the federal deductions taken from his final earning to satisfy the amount ordered through this decision.

Through his written hiring agreement, the claimant agreed to have a share of the overhead expenses deducted from the revenue he produced. In addition, he authorized deductions for personal expenses from his earnings. Therefore the employer is not in violation of the Texas Payday Law for deducting the amounts accounted for on his revenue sheets.

Insufficient evidence was provided to determine if any other doctor had been charged for the expense of her employment, during her full tenure. Insufficient evidence has been provided to reduce the $12,334.84 deduction for the nurse's receipt of earned wages and earned and unused vacation time from the claimant's final month's earnings. Based on the revenue history, the claimant was responsible for at least $4,700 of this amount as payment of wages for work performed by the nurse in April. Therefore the Commission has not factual basis to find the amount deducted was in error.

The claimant protested the inclusion of research expenses in the overhead costs charged to the associate doctors. The claimant failed to protest these charges during his employment or before this hearing date. Therefore they will be accepted as the part of the itemized list of overhead expenses, and will not be excluded from the calculation of the claimant's earnings.

**DECISION**: In accordance with the Texas Payday Law, Labor Code, Chapter 61, section 61.059, the determination order issued August 14, 2013, is modified.

The employer, MOHAMMED FAWWAZ SHOUKFEH MD PA, DBA TEXAS CARDIAC CENTER, is hereby ordered to pay to the order of the Texas Workforce Commission for the use and benefit of the claimant, JAMES G GRATTAN, wages in the amount of $5,817.32, in accordance with the attached instructions for payment.

*Sue Dennis*

S. Dennis
Hearing Officer

sd3

TWC 000029
JAMES GRATTAN 00027

347

TEXAS WORKFORCE COMMISSION

APPEAL NO. 13-055631-0
PAGE NO. 9

***IMPORTANT***
**INSTRUCTIONS TO EMPLOYER FOR PAYMENT TO THE COMMISSION**
***IMPORTANT***

**WHO MUST PAY:**

MOHAMMED FAWWAZ SHOUKFEH MD PA
DBA TEXAS CARDIAC CENTER

Pursuant to the Texas Tax Code, § 171.255, if the corporate privileges of a corporation or other taxable entity subject to the franchise tax are forfeited by the Texas Comptroller, each officer or director of the forfeited entity is liable for any debt of the entity during the period of forfeiture.

**AMOUNT OF PAYMENT:** $5,817.32 (less deductions, if applicable, for federal income tax withholding and Social Security to the extent authorized by federal law.)

**WHEN PAYMENT DUE BY EMPLOYER TO THE COMMISSION:**

November 20, 2013

**MAKE CHECK PAYABLE TO:** Texas Workforce Commission

Please note the claimant's name and Social Security number on the face of the check.

**MAIL CHECK TO:** Texas Workforce Commission
Labor Law Payment Division
P.O. Box 684483
Austin, Texas 78768-4483

**QUESTIONS ABOUT PAYMENT:** If you have questions concerning payment of the amounts assessed you may contact the Labor Law Department at:

1(800) 832-9243 or (512) 475-2670

**PAYMENT TO EMPLOYEE:** The Commission will pay the claimant wages collected and, if applicable, any interest earned on those wages.

# Texas Workforce Commission
## Appealing Texas Payday Law Decisions

If you disagree with the Payday Law decision, two methods of appeal are available:

**1. Request a Reopening of a Hearing.** If you did not participate in your hearing and have good cause for your nonappearance, you may request a reopening of your hearing within 14 days pursuant to Commission Rule 16 (40 TAC §815.16(5)). This request must explain why you were not able to appear. You may be granted a reopening if your request establishes good cause for your failure to participate. To request a reopening of your hearing, mail your request to Special Hearings Department, Texas Workforce Commission, 101 E. 15th Street, Austin, Texas, 78778, fax it to (512) 463-9318, file it online at www.texasworkforce.org/paydayappeal or visit your local TWC office.

**2. Request a review of the case by filing an Appeal to the Commission.** Section 61.0612 of the Texas Labor Code states, in part, that the Commission may permit any of the parties affected by the order to initiate a further appeal before the Commission within 14 days. To file an Appeal to the Commission, mail your appeal to Commission Appeals, Texas Workforce Commission, Room 678, 101 E. 15th St., Austin, Texas, 78778, fax it to (512) 475-2044, file it online at www.texasworkforce.org/paydayappeal, or visit your local TWC office.

### Important Instructions
Your appeal must include the following information: the claimant's name, the Payday Law appeal number, the hearing officer's name, and the date the decision was mailed. If you mail your appeal, it must be postmarked no later than 14 days from the date this decision was mailed to you. If you fax your appeal, TWC must receive it no later than 14 days from the date the decision was mailed. Keep your fax confirmation as proof of transmission. If the 14th day from the decision mailing date falls on a Texas state or federal holiday, the time limit for filing an appeal will be extended through the next working day. Appeals made prior to the decision mailing date will not be considered. You may also appeal by submitting TWC's online appeal form. Go to www.texasworkforce.org/paydayappeal.

For more information about the appeals process, visit www.texasworkforce.org/paydayappeal.

---

### APELACIÓN DE LAS DECISIONES EN VIRTUD DE LA LEY DE SALARIOS ATRASADOS DE TEXAS

Si usted no está de acuerdo con la decisión respecto de la Ley de Salarios Atrasados, tiene a su disposición dos métodos de apelación:

**1. Solicitud de Reapertura de Audiencia.** Si usted no participó de su audiencia y tiene una causa justificada para no haber asistido, podrá solicitar la reapertura de la audiencia dentro de los 14 días de conformidad con la Norma de la Comisión 16 (título 40 TAC Artículo 815.16(5)). Dicha solicitud deberá explicar los motivos de su inasistencia. Se le podrá otorgar la reapertura si su solicitud establece causa justificada para su falta de participación. A fin de solicitar la reapertura de su audiencia, envíe por correo su solicitud al Special Hearings Department, Texas Workforce Commission, 101 E. 15th Street, Austin, TX, 78778, o por fax al (512) 463-9318. También puede presentarla por Internet en www.texasworkforce.org/paydayappeal o visite su oficina local de la TWC.

**2. Solicitud de revisión del caso por medio de Apelación ante la Comisión.** El artículo 61.0612 del Código Laboral de Texas establece, en parte, que la Comisión puede autorizar a cualquiera de las partes afectadas por la orden a presentar otra apelación ante la Comisión dentro de los 14 días. A fin de interponer una apelación ante la Comisión, deberá enviar la apelación por correo a Commission Appeals, Texas Workforce Commission, Room 678, 101 E. 15th Street, Austin, TX, 78778 o por fax al (512) 475-2044. También puede presentarla por Internet en www.texasworkforce.org/paydayappeal, o visite su oficina local de la TWC.

### Instrucciones Importantes
Su apelación debe incluir la siguiente información: nombre del reclamante, el número de apelación según la Ley de Salarios Atrasados, el nombre del árbitro de la audiencia, y la fecha de envío de la decisión. Si usted envía su apelación por correo, deberá estar sellada no más de 14 días desde la fecha en que se le envió esta decisión. Si usted envía su apelación por fax, la TWC deberá recibir su apelación no más de 14 días desde la fecha en que se envió la decisión. Conserve la confirmación del fax como comprobante de la transmisión. Si el decimocuarto día de la fecha del envío de la decisión cae en un feriado estatal de Texas o feriado federal, el plazo de presentación de la apelación se extenderá hasta el siguiente día hábil. Las apelaciones realizadas con anterioridad a la fecha de envío de la decisión no serán consideradas. También podrá apelar mediante la presentación del formulario de apelación en línea de la TWC. Visite www.texasworkforce.org/paydayappeal.

Para mayor información sobre el proceso de apelación, visite www.texasworkforce.org/paydayappeal.

Equal Opportunity Employer/Programs

TWC 000031

JAMES GRATTAN 00029

349

b-1(494)

## TEXAS WORKFORCE COMMISSION
### Austin, Texas

FINDINGS AND DECISIONS OF COMMISSION
UPON REVIEW OF CLAIM FOR WAGES

FEB 0 6 2014

Date Mailed

**FILE COPY**

See reverse side for instructions

C
L
A
I
M
A
N
T

**JAMES G GRATTAN**
████████████████

Claim Number:
13-055631-0

Social Security Number:
████████████

E
M
P
L
O
Y
E
R

MOHAMMED FAWWAZ SHOUKFEH MD PA
DBA TEXAS CARDIAC CENTER
3710 21ST ST
LUBBOCK TX 79410-1220

Prior Decision Date:
October 7, 2013

Appeal Filed by:     Employer / Claimant

**CASE HISTORY:** By a determination order issued August 14, 2013, pursuant to the Texas Payday Law, Labor Code, Chapter 61, section 61.052, the business, MOHAMMED FAWWAZ SHOUKFEH MD PA DBA TEXAS CARDIAC CENTER, was ordered to pay to the Texas Workforce Commission for the benefit of the claimant, JAMES G GRATTAN, the amount of $38,435.89. Both parties appealed.

By a Wage Claim Appeal Tribunal decision issued October 7, 2013, the employer was ordered to pay to the Texas Workforce Commission for the benefit of the claimant $5,817.32. Both parties appealed.

**FINDINGS OF FACT:** The claimant was employed by the business, a Professional Association, as a Cardiologist, from June 19, 2006 through April 30, 2013. Throughout his employment, the claimant was paid based on a formula that took his net revenue from his own patients (revenue minus expenses) and subtracted his pro rata share of the expenses of the business. This arrangement was memorialized in a written agreement between the parties. For the entirety of his employment, the pro rata share was determined by dividing the expenses by the number of practicing physicians in the Association. Initially, the claimant was not paid anything for his work from September 2012 through April 2013. In May 2013, the employer calculated what the claimant was owed, dividing the business' expenses by three doctors, and paid the claimant $32,014.68.

From November 2012 through April 2013, there were four doctors practicing in the business. The employer did not divide the expenses between the four doctors because the fourth was newly licensed in Texas. The employer paid the fourth doctor a salary and counted the salary in the expenses shared between the other three doctors. The claimant did not have a say in whether or not the fourth doctor was hired.

**TEXAS WORKFORCE COMMISSION**
**COMMISSION APPEALS**
**101 EAST 15TH ST**
**AUSTIN TX  78778-0001**

## Appeal Rights from Commission Appeals

A copy of the decision of the Texas Workforce Commission is either printed on the reverse side of this form or attached.  The date of mailing of the decision is set out at the top of the decision. All mailing dates are shown as month, day, and year.

You have two methods of appeal available:  (1)  filing a motion for rehearing with the Commission, or  (2)  filing a petition for judicial review in a court of competent jurisdiction.

Section 61.0614 of the Texas Labor Code provides that this decision will become final fourteen (14) days after the date the order is mailed unless before that date, the appeal is reopened by Commission order or a party to the appeal files a written motion for rehearing.

A MOTION FOR REHEARING MUST BE FILED IN WRITING.  YOU MAY FILE BY MAILING IT DIRECTLY TO THIS OFFICE AT THE ADDRESS SHOWN ABOVE, OR BY FAX AT FAX NUMBER (512) 475-2044.  IF YOU FAX YOUR MOTION FOR REHEARING TWC MUST RECEIVE IT NO LATER THAN 14 DAYS FROM THE DATE THE DECISION WAS MAILED.

TWC WILL USE THE DATE WE RECEIVE THE FAX TO DETERMINE WHETHER YOUR APPEAL IS TIMELY.

IF YOU FILE YOUR APPEAL BY FAX, YOU SHOULD RETAIN YOUR FAX CONFIRMATION AS PROOF OF TRANSMISSION.

THE COMMISSION WILL GRANT YOUR MOTION ONLY IF IT:

(1)     DESCRIBES SPECIFIC NEW EVIDENCE THAT IS NOT IN THE RECORD,

(2)     STATES A TRUE, COMPELLING REASON WHY THE EVIDENCE WAS NOT PRESENTED AT THE EARLIER HEARING, AND

(3)     EXPLAINS SPECIFICALLY HOW THE NEW EVIDENCE WILL CHANGE THE OUTCOME OF THE CASE.

The Commission will grant your motion only if you have shown substantial reasons for granting it.  Please include the claimant's social security number and appeal number in your motion.

Section 61.062 of the Texas Labor Code provides that a party who has exhausted the party's administrative remedies, other than a motion for rehearing, may bring a suit to appeal the decision of the Commission.  The suit must be filed not later than the 30th day after the date the decision of the Commission is mailed.

PD-8(1006)

TWC 000004
JAMES GRATTAN 00002

Case No.: 13-055631-0
Page: 2

**CONCLUSIONS:** Section 61.001(7)(A) of the Texas Payday Law states that wages means compensation owed by an employer for labor or services rendered by an employee, whether computed on a time, task, piece, commission, or other basis.

Section 61.018 of the Texas Payday Law states that an employer may not withhold or divert any part of an employee's wages unless the employer: (1) is ordered to do so by a court of competent jurisdiction; (2) is authorized to do so by state or federal law; or (3) has written authorization from the employee to deduct part of the wages for a lawful purpose.

The Commission does not agree with the Wage Claim Tribunal's conclusion that the employer had the right to change the pay agreement between the parties. According to the compensation practice and agreement between the parties, the expenses of the business were divided between all the practicing doctors. The claimant's pay for September 2012 through April 2013 was improperly withheld. Thereafter, for the period from November 2012 through April 2013 the claimant's compensation was not calculated in accordance with the agreement between the parties in that the fourth doctor was not included when splitting business expenses. Thus, the claimant was underpaid. The claimant's original calculation of what he is owed is reasonable and supported by the weight of the evidence.

The claimant earned $158,003.59 from September 2012 through April 2013. Of this amount, the claimant was paid $32,014.68 (net) in May 2013. The claimant is entitled to the remainder, $125,988.91 (gross before standard deductions for taxes).

**DECISION:** In accordance with the Texas Payday Law, Labor Code, Chapter 61, section 61.059, the Wage Claim Appeal Tribunal decision, is modified.

The employer, MOHAMMED FAWWAZ SHOUKFEH MD PA DBA TEXAS CARDIAC CENTER, is hereby ordered to pay to the order of the Texas Workforce Commission for the use and benefit of the claimant, JAMES G GRATTAN, wages in the amount of $125,988.91, in accordance with the attached instructions for payment.

The last day a timely appeal may be filed is _____ FEB 2 0 2014 _____. This date includes holidays and weekends as authorized by Commission Rule.

Andres Alcantar
Commissioner Representing the Public

I dissent

Hope Andrade
Commissioner Representing Employers

Ronald G. Congleton
Commissioner Representing Labor

TWC 000005
JAMES GRATTAN 000003

353

# TAB 3

# Texas Cardiac Center

KANWAR M. SHOUKFIR, MD, FACC, FAHA    GERRY L. MARBOLM, MD, FACC
PAUL A. OVERLIE, MD, FACC, FACP    QOTAN  MALKI, MD, FACC

5130 21ˢᵗ Street
Lubbock, Texas 79410
(806) 790-5888
(806) 790-5801 cell line
(806) 790-5833 Amarillo

June 19, 2006

James Grattan, M.D.

Re: Agreement Proposal

Dear Dr. Grattan:

This letter is intended to memorialize the general terms and conditions under which Mohammed Farwas Shoukfeh, M.D., P.A. d/b/a the Texas Cardiac Center ("Association") is willing to enter into an agreement with James Grattan, M.D. ("Physician"), until such time as formal documents governing such agreement are executed in final form.

1.    Employment.  Beginning June 19, 2006, ~~Physician shall be employed by the Association~~

   A.    Physician shall practice medicine in Association's office(s), as well as in area hospitals required by Association.  Accordingly, Physician shall be required to maintain medical staff membership and appropriate clinical privileges in good standing at Lubbock Heart Hospital, Covenant Health System, and such other area hospitals as required by Association (hereinafter the "Facilities").

   B.    Physician shall be required to work the hours stipulated by Association, including equal call coverage, and clinic/catheterization lab hours, as required by Association.

   C.    Physician shall receive 6% of the Designated Health Service Revenue (as defined in Section 3(b)) during his first year of employment. Thereafter Physician's distribution of Designated Health Services Revenue shall be in accordance with a formula based on revenues from the previous year.

   D.    Physician shall be entitled to participate in Association's 401(k) plan, in accordance with the plan guidelines.

   E.    The following terms shall apply beginning June 19, 2006. Physician will be responsible for his own malpractice and health insurance, life/disability insurance expenses, communication (i.e., cell phone, pager, etc.) expenses, and other non-cardiac related expenses as well as a pro rata share of the overhead expenses incurred by Association (including, without limitation, overhead incurred by Association during periods in which Physician may be ill and therefore, absent from Association); and (II) Physician will receive Physician's Net Receipts collected by Association less Physician's pro rata share of the overhead expenses. "Physician's RECEIVED

   JUN 20 2013

   LABOR LAWS

Grattan
No.1
(5 pages)

JAMES GRATTAN



EXHIBIT
B
262

Page 2                                                                      June 19, 2008

Net Receipts" means the net amount collected by Association for services personally performed by Physician, less contractual and other adjustments, and shall exclude all Designated Health Services Revenues. "Designated Health Services Revenues" are defined as the net collections of Association for the professional and technical components of the following ancillary tests: echocardiograms, Doppler tests, chest x-rays and any other ancillary services that are deemed to be designated health services under the Stark Law (*Social Security Act §1877* and as published at Fed. 70 Reg. 70116 (Nov. 21, 2005) and as amended thereafter). The revenues from Designated Health Services Revenues will be distributed to shareholders in accordance with a formula based on revenues from the previous year.

F.    Physician shall comply with all applicable standards governing reimbursement for Physician's services under governmental and commercial third party payors. Any failure to comply with such standards shall be considered outside the scope of Physician's Agreement with Association; therefore, if Association is required to refund any payment for services furnished by Physician because Physician failed to comply with published standards or obligations set forth in a payor's relevant manuals, such as the Medicare Carriers Manual, and/or adopted by the American Medical Association or other relevant professional association, Physician agrees to reimburse Association for the amounts recouped.

G.    The Agreement may be terminated at any time upon Physician's death. In the event of Physician's death, Physician shall receive 30% of Physician's outstanding accounts receivable, less any amounts Physician may owe to Association, for a period of three (3) months following Physician's death.

H.    In the event of Physician's permanent disability, physician will receive 60% of Physician's outstanding accounts receivable, less any amounts Physician may owe to Association, for a period of three (3) months.

I.    If Physician gives a one year notice of resignation, he will be entitled to 30% of his accounts receivable for three months. If less than a one year notice of resignation is given, Physician is entitled to no accounts receivable on leaving Association.

J.    In the event of Physician's resignation, permanent disability or death, Physician is not entitled to any of the tangible and/or intangible assets of Association.

2.    **Medical Records.** All medical records generated in respect of Patients treated by Physician or any other physician engaged by Association shall be and will remain the property of Association; provided, however, that Physician shall have such right of access to such medical records as shall be provided by law.

3.    **Confidentiality.** Due to the special relationship to be established by the parties, the parties agree to maintain the confidentiality of this letter and agree not to disclose or reveal any of the terms or conditions of the arrangements described in this letter to any third party; provided, however, that any party may disclose any such information to its affiliates, officers, directors, employees and agents having a need-to-know for purposes of this transaction if such persons shall also hold such information confidential. Any party may disclose any such information as required by law.

RECEIVED
JUN 28 2013
TABOR

SEP-26-2013 10:19     From:1 806 765 5308     SPLAWN SIMPSON PITTS          Page:5/25

From:CTH&G                        1 806 744 2211         06/20/2013 10:34      #029 P.008/019

Page 3                                                                    June 19, 2006

Please indicate your agreement to the terms and conditions of this proposal and your good faith intention to enter into the Agreement by signing and returning the enclosed copy of this letter promptly. If you have not executed and returned this letter to Association prior to June 19, 2006, then the proposal described in this letter will expire.

Sincerely,

MOHAMMED FAWWAZ SHOUKFEH, M.D., P.A.

By: _____
    Mohammed Fawwaz Shoukfeh, M.D.
    President

Date: _____, 2006

JAMES GRATTAN, M.D.

By: _____
    James Grattan, M.D.

Date: _____ June 19 _____, 2006

2584187vLDOC

RECEIVED

JUN 20 2013

LABOR …

264

# TAB 4

03:07:22 p.m. 07-30-2013  4  1 806 744 2211

From: CTH&G          1 806 744 2211          07/30/2013 14:59          #212 P.004/014

# TEXAS CARDIAC CENTER

## PHYSICIAN EMPLOYMENT AGREEMENT
Mohammad Fawwaz Shoukfeh, M.D., P.A.
A Texas Professional Association
and Dr. Ahmad Qaddour

Date: November 19, 2012

RECEIVED

JUL 30 2013

LABOR LAW 4

TWC 000114

JAMES GRATTAN: 00112

186

## TABLE OF CONTENTS

ARTICLE I. EMPLOYMENT ..................................................................................................1

    Section 1.1  General Terms ...........................................................................................I

    Section 1.2  Fees Generated .........................................................................................2

    Section 1.3  Managed Care Agreements .......................................................................2

    Section 1.4  Patients and Records of the Association....................................................2

    Section 1.5  Accounts; Inspection. ...............................................................................2

    Section 1.6  Division; Subdivisions..............................................................................2

ARTICLE II. DUTIES ...........................................................................................................2

    Section 2.1  Professional Duties....................................................................................2

    Section 2.2  Representations/Covenants.........................................................................3

    Section 2.3  Evaluation of Physician.............................................................................3

ARTICLE III. COMPENSATION AND BENEFITS .............................................................4

    Section 3.1  Compensation............................................................................................4

    Section 3.2  Employment Taxes ...................................................................................4

    Section 3.3  Vacation, Professional Meetings, and Leave Time ...................................4

    Section 3.4  Professional Liability Insurance ...............................................................4

    Section 3.5  Other Insurance ........................................................................................4

ARTICLE IV. TERM AND TERMINATION.........................................................................4

    Section 4.1  Term .........................................................................................................4

    Section 4.2  Termination For Cause .............................................................................5

    Section 4.3  Termination Without Cause.......................................................................6

    Section 4.4  Effect of Termination ...............................................................................6

ARTICLE V. ASSIGNMENT OF RIGHT TO BILL .............................................................6

ARTICLE VI. CONFIDENTIALITY OF INFORMATION ...................................................6

    Section 6.1  Confidential Information ...........................................................................6

    Section 6.2  Departure...................................................................................................6

    Section 6.3  Exceptions.................................................................................................7

ARTICLE VII. NONCOMPETITION ...................................................................................7

    Section 7.1  Covenant Not to Compete .........................................................................7

    Section 7.2  Essential and Separate Covenants: Reasonableness or Restraints...............7

i

RECEIVED

JUL 3 0 2013

LABOR LAW 4

JAMES GRATTAN 001117 187

ARTICLE VIIL INDEMNIFICATION.................................................................................7

ARTICLE IX. MISCELLANEOUS.................................................................................8

    Section 9.1   Arbitration ...................................................................................8

    Section 9.2   Assignability.................................................................................8

    Section 9.3   Notice .........................................................................................9

    Section 9.4   Enforceability.................................................................................9

    Section 9.5   Governing Law...............................................................................9

    Section 9.6   Construction ..................................................................................9

    Section 9.7   Binding Effect ................................................................................9

    Section 9.8   Entire Agreement, Amendments .........................................................9

    Section 9.9   Waiver of Breach...........................................................................9

ARTICLE X. NON ENFORCEABILITY

    Section 10.1 ...................................................................................................9

    Section 10.2 ..................................................................................................10

ii

RECEIVED

JUL 3 0 2013

LABOR LAW 4

TWC 000116

JAMES GRATTAN 001188

03:07:22 p.m. 07-30-2013 | 7 | 1 806 744 2211

From:CTH&G      1 806 744 2211      07/30/2013 15:01      #212 P.007/014

RECEIVED
JUL 30 2013
LABOR LAW 4

## PHYSICIAN EMPLOYMENT AGREEMENT

## AHMAD QADDOUR, M.D.

**THIS PHYSICIAN EMPLOYMENT AGREEMENT** (this "Agreement") is made and entered as of November 19, 2012, by and between Mohammad Fawwaz Shoukfeh, M.D., P.A. d/b/a Texas Cardiac Center, a Texas professional association ("Association") and Ahmad Qaddour, M.D. ("Physician").

**WHEREAS,** the Association is a Texas professional association organized to, among other things, conduct the authorized professional services that may be performed by a doctor of medicine, duly licensed under the laws of the State of Texas.

**WHEREAS,** Physician is duly licensed or reasonably anticipates that he will be licensed to practice medicine in the State of Texas.

**WHEREAS,** the Association desires to employ and retain Physician to provide professional medical services for the Association's patients and Physician agrees to accept such employment.

**NOW, THEREFORE,** for and in consideration of the promises and of the covenants and agreements hereinafter stipulated, the mutuality and adequacy of which is now and forever acknowledged, the parties agree and covenant as follows:

### ARTICLE I. EMPLOYMENT

**Section 1.1**      General Terms. The Association employs Physician, and Physician accepts employment with the Association to provide cardiology and nuclear services to the patients of Association on a full-time basis unless otherwise agreed to or determined by the Association. The term "cardiology services" shall mean the services of a specialist in the practice of cardiology. Association agrees to accept the conditions imposed for Physician to obtain a H-1B Visa.

Physician shall render cardiology services in accordance with the Association's policies and procedures and shall perform any other related services that are reasonably assigned or reasonably requested from time to time by the Association. The Association shall provide office space, staff, and facilities, as needed, to allow Physician to carry out his duties under this Agreement. Physician shall practice medicine at the offices of Texas Cardiac Center.

**Section 1.2**      Fees Generated. Any and all Professional Fees generated hereunder during the term of this Agreement shall belong to the Association. "Professional Fees" shall mean fees, compensation, or remuneration generated by cardiology services rendered or ordered by or otherwise attributable to Physician and by administrative hospital services performed by Physician in his capacity as an employee of the Association; provided, however, that "Professional Fees" shall not include any royalties, honoraria, or the like from authored documents, speeches or similar professionally-related activities, compensation generated by Physician's expert testimony, or sums earned by Physician while on vacation and working at a teaching hospital. The Association, at its sole discretion, shall establish the fees to be charged for cardiology services. It is specifically understood and agreed that Physician shall have no right or claim to any portion of Professional Fees, except as otherwise provided in this Agreement.

Except with regard to services which shall be provided by Physician on vacation days, weekends and days off (when not on call ) Physician may not enter into other administrative or medical services agreements without Association's prior written approval, which shall not be unreasonably withheld, and any income from such agreements shall belong to Physician; provided, however, that Physician shall carry the appropriate insurance for the services he provides under the agreement and that Physician takes the appropriate measures to ensure that he is not represented to be an agent of Association while he provides services under such agreement. Any income earned for serving on a health-related committee shall be disclosed to the Association.

**Section 1.3**      Managed Care Agreements. From time to time, the Association may enter into managed care or network agreements with third party payors, employers, or governmental entities that may require the Association and/or Physician to engage in utilization review or peer review activities. Physician will fully cooperate in such activities .

1

TWC 000117
JAMES GRATTAN 001189

From:CTH&G                    1 806 744 2211          07/30/2013 15:01      #212 P.008/014

RECEIVED
JUL 30 2013
LABOR LAW 4

and will comply with any and all requirements of any managed care or network agreement to which the Association becomes a party. If required by any managed care entity or network, Physician will execute the agreement individually, notwithstanding that all Professional Fees generated by such agreement will belong to the Association. Physician shall have no authority to, and shall not, execute agreements binding the Association unless Physician has received prior approval from the Association. Provided however, it is understood that Physician shall not be required to do anything which would violate the law or Physician's exercise of independent medical judgment on behalf his patients. Association agreements to indemnify Physician from any liability to such managed care or network providers under any contract signed pursuant to this Section.

Section 1.4    Patients and Records of the Association. Without superseding any patient's right to choose a provider of health or medical services, Physician acknowledges that all patients for whom cardiology services are provided shall be patients of the Association and not of Physician. The Association shall have the authority to determine which persons will be accepted as patients of the Association and to designate which physician employee of the Association will handle each patient. During the term of this Agreement, Physician shall not induce, solicit, or encourage any patient who has received or is receiving health or medical services from the Association to seek such services from another provider. All medical and patient records, papers, and documents generated by Physician, the Association, or employees or agents of the Association shall belong to the Association and Physician shall have no right to keep or retain such records, papers, or documents after this Agreement is terminated.

Section 1.5    Accounts; Inspection. The Association shall maintain true and accurate records of accounts in accordance with accounting standards customary with respect to the practice of medicine. Such records shall be kept at the Association's office and shall be available during normal business hours for inspection by Physician solely at Physician's expense.

Section 1.6    Location of Practice . Physician agrees to practice medicine under the terms of this Agreement and at locations designated by Association. In the event the Association sells this practice then the terms herein shall continue and Physician agrees to remain with the Association's practice.

## ARTICLE II. DUTIES

Section 2.1    Professional Duties. Except as provided in Section 1.2 above, Physician shall provide cardiology services exclusively to the Association's patients at the offices of Texas Cardiac Center and the hospitals that Physician has privileges. Physician shall not engage in the practice of medicine except as an employee of the Association or engage in, carry on, or be employed by any other business or profession so as to adversely affect the performance of his duties pursuant to this Agreement, except upon approval of the Association. Physician agrees to use his best efforts in performing his duties. Physician's essential duties shall also include, but not be limited to:

(a)    providing cardiology services to patients of the Association subject to the instructions, directions, and control of the Association; and being responsible for such other duties related to the cardiology services as the Association may determine from time to time; provided, however, if Physician reasonably believes Physician is not qualified to perform a specific procedure in connection with the cardiology services, Physician may immediately notify Association and Association shall locate another physician who is qualified to perform the specific procedure;

(b)    keeping and maintaining or causing to be kept and maintained, appropriate records, reports, claims, and correspondence necessary and appropriate in connection with all cardiology services rendered by Physician under this Agreement. All of such records, reports, claims, and correspondence shall belong to the Association;

(c)    promoting, to the extent permitted by law and the applicable canons of professional ethics, the professional practice of the Association;

(d)    attending, to the extent required by policies of the Association and the applicable canons of professional ethics, the administrative duties of the professional practice of the Association;

(e)    performing all acts reasonably necessary to maintain and improve Physician's professional skills;

2

TWC 000118

JAMES GRATTAN:001190

## ARTICLE III. COMPENSATION AND BENEFITS

Section 3.1     Compensation. Physician shall begin employment on November 19, 2012, seeing patients and reading tests awaiting his hospital privileges. Until Physician receives his hospital privileges, Association will pay and Physician shall receive 45% of Physician's collections of which Association will advance Physician $10,000.00 a month against Physician's collections. Once Physician receives his privileges, the Association agrees to pay Physician $20,000.00 per month for a period of 6 months. After 6 months with the option of Physician, Physician shall receive $20,000.00 per month or 45% of his collections. After 2 years, Physician shall receive 100% of net collections and pay his portion of overhead as allocated by the Association from time to time.

Section 3.2     Employment Taxes. The Association shall withhold on behalf of Physician appropriate employment and other withholding taxes as required by law during the term of this Agreement.

Section 3.3     Vacation, Professional Meetings, and Leave Time. During the term of this Agreement, Physician shall be entitled to 3 weeks vacation and 1 week for medical meetings.

Section 3.4     Professional Liability Insurance. During the first year, Association shall provide and thereafter Physician shall maintain professional liability insurance at his sole cost and expense in an appropriate amount as determined by the Association, covering Physician for his acts and omissions in the performance of his duties hereunder. Unless agreed in writing, such coverage shall be in at least the amount of $1,000,000 per occurrence and $3,000,000 combined limit. In the event the policy is a "claims made" policy and Physician retires from the practice of medicine, ceases to be an employee of the Association, or otherwise ceases to practice medicine, the Physician shall provide at his sole cost and expense professional liability insurance tail coverage following the date of the termination of Physician's employment in an amount equal to the malpractice insurance carried during the term of this Agreement. Physician shall be responsible for paying all premiums for any tail coverage following the termination of this Agreement

Section 3.5     Other Insurance/Benefits. Physician shall be responsible to pay for his cell phone, medical education and health insurance.

## ARTICLE IV. TERM AND TERMINATION

Section 4.1   Term. This Agreement shall be effective and employment shall begin November 19, 2012 and is subject to Physician obtaining his Texas medical license and privileges at Covenant Medical Center and the Lubbock Heart Hospital. Term shall be until otherwise terminated as provided herein.

Section 4.2     Termination For Cause.

(a)     By the Association. The Association may terminate this Agreement for cause. For this purpose, "cause" shall mean good cause which reasonably justifies termination on the basis of any of the following reasons:

(i)     The suspension, revocation, surrender, or cancellation of Physician's right to practice medicine in the State of Texas or to prescribe controlled substances;

(ii)     Any adverse action taken against Physician's privileges at any location wherein the Association provided cardiology services;

(iii)     The imposition of any restrictions or limitations by any governmental authority having jurisdiction over Physician to such an extent that he cannot engage in the professional practice on the basis for which he was employed;

(iv)     Physician's material failure to perform the duties required hereunder or unreasonable failure or unreasonable refusal to comply with the policies, standards and regulations of the Association which from time to time may be established, as determined in the Board of Directors' sole discretion;

4

RECEIVED

JUL 3 0 2013

JAMES GRATTAN TABOR LAW 4

03:07:22 p.m. 07-30-2013 | 10 | 1 806 744 2211

From: CTH&G       ' 1 806 744 2211       · 07/30/2013 15:03       #212 P.010/014

(v)    Physician is found guilty of unprofessional or unethical conduct by any board, institution, organization or professional society having any privilege or right to pass upon the conduct of Physician;

(vi)   Physician's conviction in a court of competent jurisdiction of any felony offense or any misdemeanor offense involving moral turpitude;

(vii)  Physician materially breaches this Agreement;

(viii) Physician's engaging in unreasonable behavior or unreasonable activities that result in damage to the Association's reputation and/or disrupt, undermine or threaten to disrupt or undermine the operations or cohesiveness of the Association or the Physician's Subdivision;

(ix)   Failure to perform his duties as determined by the Association;

(x)    Physician's engaging in fraud or embezzlement;

(xi)   Physician's loss of malpractice insurance as a result of any action or inaction of Physician which cannot be timely replaced through diligent efforts; or

(xii)  A recommendation by the Quality Assurance and Peer Review Committee (or the full Board of Directors, if such committee has not been created), based upon substantial evidence, to terminate Physician's employment with the Association is made after full and fair investigation regarding the quality of patient care rendered by Physician is concluded.

If the President of the Association has reasonable cause to believe that any item or activity in this Section 4.2(a) has occurred, the President may restrict Physician's activities as the President deems necessary and reasonable pending the review of the item or activity by the Association's Board of Directors.

   (b)    Reporting Obligation.  Physician has an affirmative obligation as a condition of employment to report to the Association any investigation or inquiry by any regulatory agency, governmental authority, or professional society regarding any item or activity listed in Section 4.2(a) above.

   (c)    By Physician. Physician may terminate this Agreement immediately upon written notice to the Association, which notice shall describe the reason for such termination, for any of the following reasons:

      (i)    The Association dissolves;

      (ii)   The Association loses any certification or otherwise becomes unable due to any act or omission, to continue to operate; or

      (iii)  The Association's material breach of this Agreement.

   (d)    Death or Disqualification. This Agreement shall terminate upon the death of Physician. This Agreement shall also terminate upon Association's reasonable determination that Physician is "disqualified." Physician shall be deemed "disqualified" if the Association reasonably determines, in accordance with the Association's Bylaws, that Physician is unable, even with reasonable accommodation, to perform one or more of the essential job functions of his position, including, but not limited to, the essential duties listed in Section 2.1 and any other essential job functions determined by the Association, for more than ninety (90) consecutive days; provided, however, that such ninety (90) day period shall not be deemed to be broken if the Physician returns to work for no more than three (3) consecutive working days during any given attempt to resume his regular work schedule.

   (e)    Notice and Opportunity to Cure. Unless unreasonable or otherwise inappropriate under the circumstances, each party shall provide the other with written notice of any fact, event, or condition which may form the basis for termination for cause and at least thirty (30) days to cure the fact, event, or condition.

5



RECEIVED

JUL 09 02 2013

JAMES GRATTAN

192

Section 4.3    **Termination Without Cause.** This Agreement may be terminated without cause at any time by written notice at any time by Physician upon 180 days written notice to Association. This Agreement may be terminated without cause at any time by written notice at any time by Association upon sixty (60) days written notice to Physician. In the event of such termination notice, the Association may limit the Physician's activities during the notice period or the Association may impose any other restrictions it deems necessary and reasonable provided that such restrictions shall not reduce the compensation due to the Physician. Physician, subject to his covenant not to compete, upon notice of termination, shall be allowed to apply for and interview for future employment without being in violation of this agreement. Physician agrees that upon his termination with or without cause Physician shall not be entitled to receive any accounts receivable. In the event Physician shall fail to give notice as required, Physician agrees to pay to Association a sum equal to the amount of time deficit on notice times the highest monthly revenue produced by Physician on a monthly basis under this Agreement. For example, if Physician gives only 30 days notice and the highest month of production by Physician is $20,000.00, the penalty would be $20,000.00 x 5 (5 months) deficit notice or $100,000.00. Physician agrees that Association may deduct any penalty from Physician's pay checks.

Section 4.4    **Effect of Termination.** Upon any termination pursuant to this Article, the Association shall pay Physician his compensation check due under this Agreement through the effective date of termination on a pro rata basis including any incentive bonuses provided for as part of Physician's compensation package. The compensation due through the effective date of termination shall be paid to Physician as full and final satisfaction of the terms of this Agreement, and Physician shall have no further claims against the Association for compensation.

## ARTICLE V. ASSIGNMENT OF RIGHT TO BILL

As a condition of Physician's employment hereunder, Physician hereby assigns to the Association any current and future right Physician might have from time to time to bill and receive payment from any third party payor, including, without limitation, any managed care payor and the Medicare and Medicaid programs, for cardiology services rendered by Physician under this Agreement. Physician acknowledges that the Association shall submit these billings in its own name, and that Physician is hereby precluded from billing any third party payor for Physician's cardiology services under this Agreement unless required by a third party payor, in which event Physician shall bill such services with the understanding that all fees generated from such billings shall belong to the Association.

## ARTICLE VI. CONFIDENTIALITY OF INFORMATION

Section 6.1    **Confidential Information.** As of the date of the execution of this Agreement and during the course of Physician's employment, in order to allow Physician to carry out his duties hereunder, the Association has provided and will continue to provide to Physician Confidential Information (defined below). Physician agrees to keep confidential and not to use or to disclose to others during the term of this Agreement and for a period of five (5) years thereafter, except as expressly consented to in writing by the Association or required by law, any financial, accounting and statistical information, marketing plans, business plans, feasibility studies, fee schedules or books, billing information, patient files, confidential technology, proprietary information, patient lists, policies and procedures, or trade secrets of the Association, or other papers, reports, records, memoranda, documents, files, discs, or copies thereof pertaining to the Association's patients, business, sales, financial condition or products, or any matter or thing ascertained by Physician through Physician's affiliation with the Association, the use or disclosure of which matter or thing might reasonably be construed to be contrary to the best interests of the Association (collectively, the "Confidential Information"). This restriction shall not apply to medical expertise gained during the term of this Agreement or if Physician can establish that such information (i) has become generally available to and known by the public (other than as a result of an unpermitted disclosure directly or indirectly by Physician or Physician's affiliates, advisors, or representatives), (ii) has become available to Physician on a non-confidential basis from a source other than the Association or its affiliates, advisors, or representatives, provided that such source is not and was not bound by a confidentiality agreement with or other obligation of secrecy of the Association of which Physician has knowledge, or (iii) has already been or is hereafter independently acquired or developed by Physician without violating any confidentiality agreement with or other obligation of secrecy to the Association.

Section 6.2    **Departure.** Should Physician leave the employment of the Association, Physician will neither take nor retain, without prior written authorization from the Association, any Confidential Information. Physician further agrees to destroy any copies of computer discs in his possession and delete or otherwise destroy any Confidential Information contained in his personal computer. Without limiting other possible remedies to the Association for the breach of this covenant, Physician agrees that injunctive or other equitable relief shall be available to

6

RECEIVED

JUL 30 2013

LABOR LAW

JAMES GRATTAN: 00118

193

enforce this covenant, such relief to be without the necessity of posting a bond, cash, or otherwise. Physician further agrees that if any restriction contained in this paragraph is held by any court to be unenforceable or unreasonable, a lesser restriction shall be enforced in its place and remaining restrictions contained herein shall be enforced independently of each other.

Section 6.3          Exceptions.

(a)          Physician shall not be prohibited from releasing any Confidential Information to Physician's legal counsel or financial advisors, provided that Physician places such advisors under legal obligation not to disclose the Confidential Information.

(b)          It shall not be a breach of Physician's covenants under this Article VI if a disclosure is made pursuant to a court order, a valid administrative agency subpoena, or a lawful request for information by an administrative agency. Physician shall give the Association prompt notice of any such court order, subpoena, or request for information.

### ARTICLE VII. NONCOMPETITION

Section 7.1          Covenant Not to Compete. Physician recognizes that the Association's decision to enter into this Agreement is induced primarily because of the covenants and assurances made by Physician in this Agreement, that Physician's covenant not to compete is necessary to ensure the continuation of the business of the Association and the reputation of the Association, as well as to protect the Association from unfair business competition, including but not limited to, the improper use of Confidential Information, and that irrevocable harm and damage will be done to the Association if Physician competes with the Association.

It is the intent of the Association to provide Physician to a large and broad based practice which Association has developed for many years. Therefore, during the term and for a period of 2 years following termination of this Agreement, Physician shall not, without the prior written consent of the Association, directly or indirectly, either individually or as a partner, joint ventures, employee, agent, officer, director, shareholder or member of any person or entity, (i) provide cardiology services in Lubbock County Texas; or soliciting or providing cardiology services to any patient that was a patient of Association at any time during the terms of this Agreement during the term or any renewal term hereof, or (ii) solicit for employment, or employ or engage any individual who is employed by the Association or any affiliate of the Association, including, but not limited to, employees of any management services organization or other entity, the majority of the equity interests of which is owned by the shareholders of the Association.

Upon termination of this Agreement or Physician's employment, Physician shall have access to (i) a list of Physician's patients whom Physician has seen or treated within one year of termination of this Agreement or Physician's employment, and (ii) medical records of the Physician's patients upon authorization of the patient and any copies of medical records for a reasonable fee as established by the Texas Medical Board under Section 5.08(o) of the Texas Medical Practice Act, provided, that, such patient list and medical records of Physician's patients shall be provided by the Association in the format that the records are regularly maintained by the Association, except as may be mutually agreed to by Physician and the Association. Physician shall not be prohibited from providing continuing care and treatment to a specific patient or patients during the course of an acute illness at any time, including following the termination of this Agreement or Physician's employment.

Physician shall have the right to buy out the covenant not to compete under this Section 7.1 at a reasonable price, which price is agreed to be $500,000.00. This provision controls over Section 9.1.

Section 7.2          Essential and Separate Covenants: Reasonableness or Restraints. Sections 7.1 shall be construed as an Agreement independent of any other provision in this Agreement; no claim or cause of action asserted by Physician against the Association, whether predicated upon this or other Sections of this Agreement or otherwise shall constitute a defense of the enforcement of Sections 7.1 of this Agreement.

It is understood by and between the parties hereto that the covenants set forth in Sections 7.1 of this Agreement are essential elements of this Agreement, and that, but for the agreement of Physician to comply with such covenants, the Association would not have agreed to enter into this Agreement. The Association and Physician agree that the foregoing



RECEIVED
TWC 000122
JAMES GRATTAN    JUL 30 2013
194

covenants are appropriate and reasonable when considered in light of the nature and extent of the practice conducted by the Association.

If any provision or subdivision of this Agreement, including, but not limited to, any aspect of the restraints imposed under Section 7.1 is found by a court of competent jurisdiction to be unreasonable or otherwise unenforceable, any such portion shall nevertheless be enforceable to the extent such court shall deem reasonable, and, in such event, it is the parties' intention, desire and request that the court reform such portion in order to make it enforceable. In the event of such judicial reformation, the parties agree to be bound by Section 7.1 as reformed in the same manner and to the same extent as if they had agreed to such reformed Sections in the first instance.

## ARTICLE VIII. INDEMNIFICATION

Subject to the limitations provided below, Physician acknowledges and agrees that he shall indemnify, hold harmless, and reimburse and/or expressly authorizes the Association to charge as a direct expense to Physician any and all reasonable costs, charges, and expenses in the aggregate, including, but not limited to, any accounting or legal expenses or other advisory fees incurred by the Association in connection with its own representation or involvement in any matter arising from any and all acts of Physician occurring from any activity or action (passive or active) that is unrelated to providing cardiology services for or on behalf of the Association. Physician acknowledges and agrees should such costs or expenses be incurred during Physician's employment, or be pending at a time when an act or event occurs under the preceding sentence, for any reason, Physician expressly allows, agrees, and consents to the Association's withholding and offsetting any reasonable and necessary costs or expenses realized, paid, or anticipated (or as may be reasonably anticipated) from any payments due or owing to Physician under any provision of this Agreement. The costs and expenses referred to herein are those directly or indirectly chargeable and payable by the Association that are not covered by insurance or other reimbursement that may be available or payable to the Association. The acts, conduct, or omissions contemplated by this Article apply to all matters, activities, actions, or resulting matters other than those associated with providing cardiology services for or on behalf of the Association, and as such shall apply to any action or conduct that may result in an economic detriment to the Association.

Association acknowledges and agrees that it shall indemnify, hold harmless, and reimburse and/or expressly authorizes the Physician to charge as a direct expense to Association any and all reasonable costs, charges, and expenses, including, but not limited to, any accounting or legal expenses or other advisory fees incurred by the Physician in connection with his own representation or involvement in any matter arising from any and all acts of Physician occurring from any activity or action (passive or active) that is related to providing cardiology services for or on behalf of the Association. The costs and expenses referred to herein are those directly or indirectly chargeable and payable by the Physician that are not covered by insurance or other reimbursement that may be available or payable to the Physician. The acts, conduct, or omissions contemplated by this Article apply to all matters, activities, actions, or resulting matters associated with providing cardiology services for or on behalf of the Association, and as such shall apply to any action or conduct that may result in an economic detriment to the Association. <u>The right to indemnification provided by the Association shall not be affected or diminished by the fact that the Physician's negligence is the sole or a concurrent cause of the liability for which indemnity is sought.</u>

## ARTICLE IX. MISCELLANEOUS

Section 9.1    <u>Arbitration.</u> The parties agree to use good faith negotiation to resolve any dispute, claim, or controversy that may arise under or relate to this Agreement, Physician's relationship to the Association or to a breach of this Agreement and will attempt to reach an amicable resolution of the dispute. In the event that the parties are not able to resolve any dispute, claim, or controversy by negotiation or mediation, any such dispute, claim, or controversy shall be settled by binding arbitration which shall be conducted in Fort Worth, Texas, in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Each party will bear its own costs in the arbitration, and the fees and expenses of the arbitration will be shared equally by the parties. Notwithstanding the foregoing, the arbitrator, in his sole discretion, may determine that the party against whom the decision is rendered shall pay the prevailing party's costs and share of the arbitrator's fees and expenses.

Section 9.2    <u>Assignability.</u> Neither party may assign its rights or duties under this Agreement without the prior written consent of the other party.

8

RECEIVED

TWC 000123

JAMES GRATTAN  00 JUL 3 0 2013

195

03:07:22 p.m. 07-30-2013 | 14 | 1 806 744 2211

From: CTH&G       1 806 744 2211       07/30/2013 15:07       #212 P.014/014

Section 9.3   Notice. Any notice, demand, or communication required, permitted, or desired to be given under this Agreement shall be deemed effectively given when personally delivered or mailed by prepaid certified mail, return receipt requested, addressed to the party at the primary address of the Association or, if appropriate, at the residence of Physician on file with the Association, or to such other address and to the attention of such other person(s) or officer(s) as either party may designate by written notice.

Section 9.4   Enforceability. Should any provision of this Agreement be held invalid, unenforceable, or unconstitutional by any governmental body or court of competent jurisdiction, such holding shall not diminish the validity or enforceability of any other provision hereof. The parties further request and desire that the court reform such provision that is deemed invalid in order to make it enforceable.

Section 9.5   Governing Law. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Texas.

Section 9.6   Construction. Common nouns and pronouns and all other terms shall be deemed to refer to the masculine, feminine, neuter, singular and/or plural, as the identity of the person or persons, firm or association may require in the context.

Section 9.7   Binding Effect. The provisions of this Agreement shall inure to the benefit of and shall be binding on the heirs, personal representatives, successors, assigns, estates and legatees of each of the parties hereto.

Section 9.8   Entire Agreement, Amendments. This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior or contemporaneous agreements, understandings, or negotiations of the parties. Any employment agreement or independent contractor agreement between Physician and any predecessor entity to the Association is hereby revoked. This Agreement shall not be modified, amended, or supplemented except in a written instrument executed by both parties.

Section 9.9   Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

## ARTICLE X. NON-ENFORCEABILITY

Section 10.1   Each and every term of this Agreement is subject to Physician's H-1B Visa. If any term violates any condition of Physician's Visa then that term or provision shall be unenforceable and all remaining terms shall remain in full force and effect.

Section 10.2   If it is determined that any provision violates any condition of Physician's H-1B Visa then at the option of the Association, this Agreement may be immediately terminated.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed to be effective as of the date and year first above written.

ASSOCIATION:

Mohammad Fawwaz Shoukfeh, M.D., P.A.
d/b/a Texas Cardiac Center,

Mohammad Fawwaz Shoukfeh, M.D.

PHYSICIAN:

Ahmad Qaddour, M.D., Individually       Nov. 14. 2012

9

RECEIVED
JUL 30 2013
LABOR LAW 4

TWC 000124
JAMES GRATTAN 00122

196

# TAB 5

Barbara Sucsy
District Clerk
Lubbock County, Texas

CAUSE NO. 2014-510,479

| | | |
|---|---|---|
| MOHAMMED FAWWAZ SHOUKFEH, MD PA, d/b/a TEXAS CARDIAC CENTER | § § § § | IN THE 99th DISTRICT COURT |
| *Plaintiff,* | § | |
| v. | § § | OF |
| | § | |
| JAMES G. GRATTAN TEXAS WORKFORCE COMMISSION | § § | |
| *Defendant.* | § | LUBBOCK COUNTY, TEXAS |

TB

## AFFIDAVIT OF SHIRLEY WILLS

| | |
|---|---|
| STATE OF TEXAS | § § |
| COUNTY OF LUBBOCK | § |

Before me, the undersigned authority, on this day personally appeared Shirley Wills a person whose identity is known to me and who signed below. After I administered an oath to the affiant, she testified as follows:

"My name is Shirley Wills. I am over the age of eighteen (18), of sound mind, and not otherwise incompetent to make this Affidavit. I have personal knowledge of the facts stated herein and they are true and correct.

I have been a Certified Public Accountant since 1976 and worked as a CPA and partner for Mason Warner & Co. Since August of 1999 I have been the accountant for Mohammed Fawwaz Shoukfeh, M.D., P.A. d/b/a Texas Cardiac Center. As such, I have prepared monthly calculations of income and expenses for the physicians within the Group. James Grattan, M.D. was one of the physicians in the Group from June of 2006 thru April of 2013. Each physician was well aware that they were paid under a "eat what you kill" scenario wherein I calculated each physicians revenues less the overhead expenses on a monthly basis. The surplus or excess would be paid to the physicians. If the physician's revenue was not sufficient to cover the overhead then no draw would be issued until there was sufficient revenue to cover the physicians'



expenses. Each physician was submitted a monthly accounting of their income and **expenses**. Grattan never objected to the accounting until his departure from the practice. Grattan was well aware that any new physician joining the practice would have a salary guarantee until he could become established. Grattan never objected to receiving his share of the new physician's income and the overhead was miniscule as the new physician was not licensed in Texas nor did he have staff privileges at local hospitals. When Grattan left the practice and gave his notice he was owed and was paid $32,014.66. I have reviewed the Summary Judgment of Texas Cardiac and can state that the allegations are true and correct. Exhibit "B" to the Motion for Summary Judgment is a true and correct copy of Grattan's Physician Employment Agreement setting forth the manner in which he was to be paid. Exhibit "C" to the Summary Judgment is a true and correct copy of calculations of the income and expenses determining the amount of compensation paid to by Grattan. Exhibit "D" to the Summary Judgment is a true and correct copy of Grattan's Departure Notice. Exhibit "E" is the final disbursement check to Grattan which he apparently and intentionally did not cash and misrepresented this to the TWC Hearing Officer when he had received the check which ultimately did clear. Exhibit "F" is proof of the amount that was taken out of Grattan's January check for federal income taxes and other mandated deductions by law which were an issue before the TWC."

"Further affiant sayeth naught."

_Shirley Wills_
Shirley Wills

Subscribed and sworn to before me on ____Sept. 8th____, 2014.

_Mary Beth Todd_
Notary Public of Texas

My commission expires:

MARY BETH TODD
Notary Public, State of Texas
My Commission Expires 12-01-2014

261

# TAB 6

| JGG - SEPT 2012 | Receipts | Charges | Adjustments | Net A/R | Total A/R | Proc. |
|---|---|---|---|---|---|---|
| | $ 103,376.09 | | | | | |
| Pt. Refunds | $ - | | | | | |
| 1/3 Mafri | $ 295.23 | | | | | |
| Nuclear Adj Stark | $ 1,542.99 | | | | | |
| Echo, X-Ray,Perp Adj | $ (175.33) | | | | | |
| Net Receipts | $ 105,040.98 | | | | | |

| | | | | |
|---|---|---|---|---|
| | | Net Receipts | $ | 105,040.98 |

| Expenses | | | | | |
|---|---|---|---|---|---|
| Advertising | $ - | | LESS: Shared Equally | $ | 75,301.91 |
| Bank Serv Charges | $ -695.13 | | Nuclear | : | 1,727.40 |
| Contract Labor | $ 819.74 | | Echo,X-Ray | 3 | 3,681.26 |
| Employee Ben. Research | $ 708.91 | | Personal Employee Exp | .$ | 4,204.56 |
| Employee Ben. Other | $ 13,541.96 | | Dues, Subs | .$ | 111.83 |
| Equipment Rental | $ 7,115.00 | | Health Ins | $ | 1,741.34 |
| Liability INS-TCC | $ 1,534.11 | | Liability Ins | $. | |
| INS. Other | $ . - | | Licenses | $ | 80.00 |
| Interest | $ 105.92 | | Payroll Taxes | $ | 1,430.12 |
| Lab Fees | $ 1,780.04 | | Cell Phone | $ | 402.36 |
| Laundry | $ 129.39 | | Travel | $ | 845.00 |
| Medical Supplies | $ 1,250.90 | | Meals | $ | 849.81 |
| Office Supplies | $ 3,485.31 | | Legal Fees | $ | - |
| Research Supplies | $ 56.45 | | Net Expenses | $ | 90,019.82 |
| Transcription Serv | $ 3,849.86 | | | | |
| Printing and Reprod. | $ 695.59 | | Net before tax and Pers. Ded. | $ | 15,024.36 |
| Patient STMTS | $ 670.33 | | | | |
| Postage and Delivery | $ 1,865.91 | | | | |
| Accounting & Legal | $ 3,700.00 | | | | |
| Recruiting | $ 708.00 | | | | |
| Rent | $ 27,000.00 | | | | |
| Bldg & Equip Rep. | $ 1,376.75 | | | | |
| Janitorial | $ 1,691.22 | | | | |
| Medical Support Sal. | $ 43,010.05 | | | | |
| Office Support Sal. | $ 33,479.36 | | | | |
| Research Salaries | $ 9,251.75 | | | | |
| NM State taxes | $ 228.68 | | | | |
| Payroll taxes | $ 6,015.12 | | | | |
| Answering Service | $ 540.18 | | | | |
| Pager Service | $ 940.72 | | | | |
| Telephone | $ 2,496.00 | | | | |
| Utilities | $ 2,144.08 | | | | |
| Property Taxes | $ 16,000.00 | | | | |
| Nuclear OH | $ 61,690.39 | | | | |
| Echo, x-ray OH | $ 7,373.80 | | | | |
| Nuclear Expenses | $ (24,565.61) | | | | |
| Echo, X-ray Expenses | $ (26,944.87) | | | | |
| Total | $ 225,905.74 | | | | |
| Shared equally | $ 75,301.91 | | | | |

JAMES GRATTAN

EXHIBIT

C
265

| UGG - OCT 2012 | Receipts | Charges | Adjustments | Net A/R | Total A/R | Proc. |
|---|---|---|---|---|---|---|
| | $ 93,427.37 | | | | | |
| Pt. Refunds | $ - | | | | | |
| 1/2 Arlyo | $ - | | | | | |
| 1/2 Maddoux | $ - | | | | | |
| 1/3 Maid | $ 264.37 | | | | | |
| Nuclear Adj Stark | $ 7,431.60 | | | | | |
| Echo, X-Ray, Perp Adj | $ (3,471.53) | | | | | |
| Net Receipts | $ 97,651.51 | | | | | |
| | | | | | | |
| Expenses | | | | | | |
| Advertising | $ - | | | | | |
| Bank Serv Charges | $ 583.17 | | | | | |
| Contract Labor | $ 121.06 | | | | | |
| Employee Ben. Research | $ 1,262.52 | | | | | |
| Employee Ben. Other | $ 10,604.96 | | | | | |
| Equipment Rental | $ 7,494.97 | | | | | |
| Liability INS-TCC | $ 2,738.00 | | | | | |
| INS. Other | $ (3,162.53) | | | | | |
| Interest | $ - | | | | | |
| Lab Fees | $ 733.50 | | | | | |
| Laundry | $ 1,046.41 | | | | | |
| Medical Supplies | $ 198.82 | | | | | |
| Office Supplies | $ 3,916.15 | | | | | |
| Research Supplies | $ - | | | | | |
| Transcription Serv | $ 6,347.21 | | | | | |
| Printing and Reprod. | $ 975.43 | | | | | |
| Patient STMTS | $ 1,966.02 | | | | | |
| Postage and Delivery | $ 1,252.01 | | | | | |
| Accounting & Legal | $ 8,650.15 | | | | | |
| Recruiting | $ 574.00 | | | | | |
| Rent | $ 28,000.00 | | | | | |
| Bldg & Equip Rep. | $ 1,310.15 | | | | | |
| Janitorial | $ 1,290.57 | | | | | |
| Medical Support Sal. | $ 37,769.46 | | | | | |
| Office Support Sal. | $ 27,207.00 | | | | | |
| Research Salaries | $ 9,805.60 | | | | | |
| NM State taxes | $ 99.04 | | | | | |
| Payroll taxes | $ 7,026.53 | | | | | |
| Answering Service | $ 795.55 | | | | | |
| Pager Service | $ - | | | | | |
| Telephone | $ 726.02 | | | | | |
| Utilities | $ 2,521.83 | | | | | |
| Property Taxes | $ 5,000.00 | | | | | |
| Nuclear OH | $ 56,135.00 | | | | | |
| Echo, x-ray OH | $ 6,179.32 | | | | | |
| Nuclear Expenses | $ (37,195.21) | | | | | |
| Echo, X-ray Expenses | $ (25,469.28) | | | | | |
| Total | $ 163,356.66 | | | | | |
| Shared equally | $ 81,096.84 | | | | | |

| | | |
|---|---|---|
| Net Receipts | $ | 97,651.51 |
| | | |
| LESS: Shared Equally | $ | 81,096.54 |
| Nuclear | $ | 2,150.38 |
| Echo,X-Ray | $ | 1,231.05 |
| Personal Employee Exp | $ | 4,656.55 |
| Dues, Subs | $ | - |
| Health Ins | $ | 1,741.34 |
| Liability Ins | $ | (1,379.00) |
| Licenses | $ | - |
| Payroll Taxes | $ | - |
| Cell Phone | $ | 401.61 |
| Travel | $ | .29.22 |
| Meals | $ | - |
| Legal Fees | $ | - |
| Net Expenses | $ | 69,629.69 |
| | | |
| Net before tax and Pers. Ded. | $ | 28,022.12 |

TWC 000103

266

| JGG - NOV 2012 | | Receipts | Charges | Adjustments | Net A/R | Total A/R | Proc. |
|---|---|---|---|---|---|---|---|
| | $ | 84,030.97 | | | | | |
| Pt. Refunds | $ | - | | | | | |
| | $ | - | | | | | |
| 1/2 Maddoux | $ | - | | | | | |
| 1/3 Matd | $ | 145.44 | | | | | |
| Nuclear Adj Stark | $ | 11,487.76 | | | | | |
| Echo, X-Ray, Psp Adj | $ | (4,339.21) | | | | | |
| Net Receipts | $ | 91,324.96 | | | | | |
| | | | | | | | |
| Expenses | | | | | | | |
| Advertising | $ | - | | | | | |
| Bank Serv Charges | $ | 605.60 | | | | | |
| Contract Labor | $ | 440.00 | | | | | |
| Employee Ben. Research | $ | 1,282.62 | | | | | |
| Employee Ben. Other | $ | 8,933.82 | | | | | |
| Equipment Rental | $ | 115.00 | | | | | |
| Liability INS-TGC | $ | 7,115.00 | | | | | |
| INS. Other | $ | 670.47 | | | | | |
| Interest | | | | | | | |
| Lab Fees | $ | - | | | | | |
| Laundry | $ | 1,088.91 | | | | | |
| Medical Supplies | $ | 966.86 | | | | | |
| Office Supplies | $ | 1,601.50 | | | | | |
| Research Supplies | $ | 2,063.38 | | | | | |
| Transcription Serv | $ | - | | | | | |
| Printing and Reprod. | $ | 2,894.09 | | | | | |
| Patient STMTS | $ | 281.86 | | | | | |
| Postage and Delivery | $ | 1,814.11 | | | | | |
| Accounting & Legal | $ | 1,576.05 | | | | | |
| Recruiting | $ | 7,870.20 | | | | | |
| Rent | | | | | | | |
| Bldg & Equip Rep. | $ | 25,000.00 | | | | | |
| Janitorial | $ | 3,031.76 | | | | | |
| Medical Support Sal. | $ | 1,732.11 | | | | | |
| Office Support Sal. | $ | 37,694.36 | | | | | |
| Research Salaries | $ | 28,092.59 | | | | | |
| NM State taxes | $ | 9,806.60 | | | | | |
| Payroll taxes | $ | 30.19 | | | | | |
| Answering Service | $ | 7,760.03 | | | | | |
| Pager Service | $ | 688.61 | | | | | |
| Telephone | $ | - | | | | | |
| Utilities | $ | 1,188.00 | | | | | |
| Property Taxes | $ | 2,044.21 | | | | | |
| Nuclear OH | $ | 8,000.00 | | | | | |
| Echo, x-ray OH | $ | 61,013.21 | | | | | |
| Nuclear Expenses | $ | 4,808.72 | | | | | |
| Echo, X-ray Expenses | $ | (22,128.20) | | | | | |

| | | |
|---|---|---|
| Net Receipts | $ | 91,324.96 |
| | | |
| LESS: Shared Equally | $ | 58,741.39 |
| Nuclear | $ | 144.95 |
| Echo, X-Ray | $ | 949.45 |
| Personal Employee Exp | $ | 4,799.26 |
| Dues, Subs | $ | 970.00 |
| Health Ins | $ | 1,741.94 |
| Liability Ins | $ | 2,447.76 |
| Licenses | $ | - |
| Payroll Taxes | $ | 1,766.30 |
| Cell Phone | $ | 470.03 |
| Travel | | |
| Meals | $ | 54.22 |
| Legal Fees | $ | - |
| Net Expenses | $ | 70,036.79 |
| | | |
| Net before tax and Pers. Ded. | $ | 21,238.17 |

JAMES GRATTAN WILEY

| | | |
|---|---|---|
| Echo, X-ray Expenses | $ | (22,128.20) |
| Total | $ | (24,105.04) |
| Shared equally | $ | 170,224.18 |
| | $ | 58,741.38 |

JAMES GRATTAN:00123

TWC 000105

268

| JGG - DEC 12 | Receipts | Charges | Adjustments | Net A/R | Total A/R | Proc. |
|---|---|---|---|---|---|---|
| | $ 92,171.49 | | | | | |
| | $ - | | | | | |
| 1/2 Maddoux | $ - | | | | | |
| 1/3 Madd | $ 98.73 | | | | | |
| Nuclear Adj Stark | $ 3,389.33 | | | | | |
| Echo, X-Ray,Perp Adj | $ 33.86 | | | | | |
| Net Receipts | $ 95,691.40 | | | | | |
| EXPENSES | | | | | | |
| Advertising | $ 574.00 | | | | | |
| Bank Serv Charges | $ 584.79 | | | | | |
| Contract Labor | $ 741.22 | | | | | |
| Employee Ben. Research | $ 1,529.88 | | | | | |
| Employee Ben. Other | $ 11,636.30 | | | | | |
| Ins-Cobra | $ - | | | | | |
| Equipment Rental | $ 7,116.00 | | | | | |
| Liability INS-TCO | $ (6,416.83) | | | | | |
| INS, Other | $ 3,615.00 | | | | | |
| Interest | $ 129.28 | | | | | |
| Lab Fees | $ 1,286.75 | | | | | |
| Laundry | $ 110.07 | | | | | |
| Medical Supplies | $ 69.61 | | | | | |
| Office Supplies | $ 2,005.04 | | | | | |
| Research Supplies | $ 100.00 | | | | | |
| Transcription Serv | $ 15,974.86 | | | | | |
| Printing and Reprod. | $ 1,105.57 | | | | | |
| Patient STMTS | $ 2,622.11 | | | | | |
| Postage and Delivery | $ 1,318.35 | | | | | |
| Accounting & Legal | $ 8,150.00 | | | | | |
| Recruiting | | | | | | |
| Rent | $ 25,000.00 | | | | | |
| Bldg & Equip Rep. | $ 2,097.92 | | | | | |
| Janitorial | $ 1,406.14 | | | | | |
| Medical Support Sal. | $ 45,726.80 | | | | | |
| Office Support Sal. | $ 38,063.79 | | | | | |
| Research Salaries | $ 11,590.60 | | | | | |
| NM State taxes | $ - | | | | | |
| Payroll taxes | $ 10,481.59 | | | | | |
| Answering Service | $ 529.05 | | | | | |
| Pager Service | $ - | | | | | |
| Telephone | $ - | | | | | |
| Utilities | $ 2,014.98 | | | | | |
| Property Taxes | $ 3,138.81 | | | | | |
| Ancillary expense | $ 69,294.44 | | | | | |
| Less: Nuclear OH | $ (21,114.94) | | | | | |
| Less: Echo, x-ray OH | $ (28,494.75) | | | | | |
| Less: Isotope Reimb | $ (52,541.51) | | | | | |
| Total | $ 162,670.48 | | | | | |
| Shared equally | $ 54,223.48 | | | | | |

| | | |
|---|---|---|
| Net Receipts | $ | 95,691.40 |
| LESS: Shared Equally | $ | 54,223.48 |
| Nuclear | $ | 6,266.04 |
| Echo, X-Ray | $ | 8,476.99 |
| Personal Employee Exp | $ | 4,951.88 |
| Dues, Subs | $ | 16.00 |
| Health Ins | $ | 2,070.11 |
| Liability Ins | $ | - |
| Licenses | $ | - |
| Payroll Taxes | $ | 563.75 |
| Cell Phone | $ | 490.59 |
| Travel | | |
| Meals | $ | 29.22 |
| Legal Fees | $ | - |
| Net Expenses | $ | 77,119.60 |

| | | |
|---|---|---|
| Net Before tax and Pers. Ded. | $ | 18,572.40 |
| Personal deductions | $ | (13.31) |

TWC 000106

JAMES GRATTAN 000.05

269

| JGG - Jan 2013 | Receipts | Charges | Adjustments | Net A/R | Total A/R | Proc. |
|---|---|---|---|---|---|---|
| | $ 64,069.00 | | | | | |
| Pt. Refunds | | | | | | |
| 1/2 Ariyo | | | | | | |
| 1/2 Maddoux | | | | | | |
| 1/4 Maid | $ 95.39 | | | | | |
| Others | | | | | | |
| Nuclear Adj Stark | $ 1,405.54 | | | | | |
| Echo, X-ray, Periph Adj | $ 403.03 | | | | | |
| Net Receipts | $ 65,972.96 | | | | | |

| Expenses | | |
|---|---|---|
| Dues & Subscriptions | $ | 662.00 |
| Bank Serv Charges | $ | 420.25 |
| Contract Labor | $ | 1,247.00 |
| Employee Ben. Research | $ | 1,529.86 |
| Employee Ben. Other | $ | 8,812.58 |
| Equipment Rental | $ | 7,115.00 |
| Liability INS-TCC | $ | (86.66) |
| Interest | $ | 64.51 |
| Lab Fees | $ | 1,241.75 |
| Laundry | $ | 96.52 |
| Medical Supplies | $ | 1,095.98 |
| Office Supplies | $ | 4,246.82 |
| Transcription Serv | $ | 6,671.03 |
| Printing and Reprod. | $ | - |
| Patient STMTS | $ | 762.06 |
| Postage and Delivery | $ | -1,110.24 |
| Accounting & Legal | $ | -5,500.00 |
| Recruiting | $ | 576.00 |
| Rent | $ | 25,000.00 |
| Bldg & Equip Rep. | $ | 1,580.95 |
| Janitorial | $ | 1,432.62 |
| Medical Support Sal. | $ | 45,641.52 |
| Office Support Sal. | $ | 40,971.96 |
| Research Salaries | $ | 9,805.60 |
| Dr. Q | $ | 10,000.00 |
| Payroll taxes | $ | 14,264.30 |
| Answering Service | $ | 842.37 |
| Telephone | $ | 2,178.12 |
| Utilities | $ | 1,716.82 |
| Property Taxes | $ | - |
| Nuclear OH | $ | 107,201.16 |
| Less Nuc OH | $ | (55,924.05) |
| Echo, x-ray OH | $ | 4,652.60 |
| Less Echo, X-ray OH | $ | (23,842.86) |
| Less techops rehab | $ | (53,842.88) |
| Total | $ | 155,001.11T |
| Divided Equally | $ | -65,220.98 |

Handwritten near Total: 229,505.86
Handwritten near Divided Equally: 76,501.68

| | | | | | |
|---|---|---|---|---|---|
| | | Net Receipts | $ | 65,972.96 | |
| LESS: | OH Shared Equally | $ | (65,220.98) | *76,501.68* |
| | Nuclear OH | $ | (9,790.32) | |
| | Echo - X-ray OH | $ | (6,864.19) | |
| | Personal Employee | $ | (4,732.00) | |
| | Dues & Subscriptions | $ | (611.35) | |
| | Health Ins | $ | (2,070.11) | |
| | Cell Phones | $ | (1,011.55) | |
| | Liability Insurance | $ | (2,447.76) | |
| | Travel & Meals | $ | (1,160.51) | |
| | Net Expenses | $ | (16,455.85) | *-105,409.80* |

| | | | |
|---|---|---|---|
| Net before tax and Pers. Ded. | $ | 16,155.69 | *39,436.34* |
| Personal | | -890.57 | |

TWC 000107

JAMES GRATTAN 0145.00

270

**JGG - Feb 2013**

| | Receipts | Charges | Adjustments | Net A/R | Total A/R | Proc. |
|---|---|---|---|---|---|---|
| | $ 66,457.36 | | | | | |
| Pt. Refunds | | | | | | |
| 1/2 Ariyo | | | | | | |
| 1/2 Maddoux | | | | | | |
| 1/4 Naiki | $ 102.10 | | | | | |
| Others | | | | | | |
| Nuclear Adj Stark | $ 657.27 | | | | | |
| Echo, X-ray, Periph Adj | $ 63.06 | | | | | |
| Net Receipts | $ 87,289.79 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Expenses | | | Net Receipts | $ 87,289.79 | |
| Ancillary Expenses | $ 50,511.26 | LESS: | JH Shared Equally | $ (54,195.75) | |
| Bank Serv Charges | $ 538.95 | | Nuclear OH | $ (7,312.94) | |
| Contract Labor | $ 2,662.31 | | Echo - X-ray OH | $ (9,181.93) | |
| Employee Ben. Research | $ 1,405.10 | | Personal Employee | $ (4,929.91) | |
| Employee Ben. Other | $ 9,448.10 | | Dues & Subscriptions | $ (524.55) | |
| Equipment Rental | $ 7,115.00 | | Health Ins | $ (2,070.11) | |
| Liability INS-TCO | $ 1,476.45 | | Cell Phones | $ (16.09) | |
| Employee benefits Cobra | $ 85.00 | | Liability Insurance | | |
| Lab Fees | $ 1,200.83 | | Travel & Meals | $ (573.76) | |
| Laundry | $ 1,021.31 | | Net Expenses | $ (78,904.45) | |
| Medical Supplies | $ 764.72 | | | | |
| Office Supplies | $ 1,432.82 | | Net before tax and Pers. Ded. | $ 8,385.34 | |
| Transcription Serv | $ 7,944.89 | | Personal | | |
| Printing and Reprod. | $ - | | | | |
| Patient STMTS | $ 1,729.37 | | | | |
| Postage and Delivery | $ 1,245.84 | | | | |
| Accounting & Legal | $ 8,300.00 | | | | |
| Recruiting | $ - | | | | |
| Rent | $ 22,000.00 | | | | |
| Bldg & Equip Rep. | $ 2,471.08 | | | | |
| Janitodal | | | | | |
| Medical Support Sal. | $ 44,164.50 | | | | |
| Office Support Sal. | $ 28,659.72 | | | | |
| Research Salaries | $ 9,505.51 | | | | |
| Training | $ 450.00 | | | | |
| Payroll taxes | $ 8,852.59 | | | | |
| Answering Service | $ 976.52 | | | | |
| Telephone | | | | | |
| Utilities | $ 1,754.86 | | | | |
| Property Taxes | $ - | | | | |
| Less Nuclear Exp | $ (23,626.79) | | | | |
| Echo,X-ray exp | $ (26,325.66) | | | | |
| Total | $ 162,567.36 | | | | |
| Divided Equally | $ 54,195.78 | | | | |

TWC 000108

271

**JGG - MARCH 2013**

| | Receipts | Charges | Adjustments | Net A/R | Total A/R | Proc. |
|---|---|---|---|---|---|---|
| | $ 71,807.46 | | | | | |
| Pt. Refunds | | | | | | |
| 1/2 Ariyo | | | | | | |
| 1/2 Maddoxx | | | | | | |
| 1/4 Mahl | $ 195.51 | | | | | |
| Others | | | | | | |
| Nuclear Adj Stark | $ 804.40 | | | | | |
| Echo, X-ray, Periph Adj | $ (39.85) | | | | | |
| Net Receipts | $ 72,767.50 | | | | | |

| | | |
|---|---|---|
| | Net Receipts | $ 72,767.50 |

| Expenses | | | | LESS: | | |
|---|---|---|---|---|---|---|
| Advertising | $ 840.93 | | | | OH Shared Equally | $ (59,865.08) |
| Accounting & Legal | $ 2,800.00 | | | | Nuclear OH | $ (4,832.55) |
| Ancillary Expense | $ 48,562.81 | | | | Echo - X-ray OH | $ (8,105.68) |
| Answering Service | $ 661.75 | | | | Personal Employee | $ (1,836.84) |
| Bank Serv Charges | $ 493.54 | | | | Dues & Subscriptions | $ (597.50) |
| Bldg & Equip Rep. | $ 537.50 | | | | Health Ins | $ (2,070.11) |
| Contract Labor | $ 633.96 | | | | Cell Phones | $ (15.09) |
| Dues & subs | $ 135.00 | | | | Payroll Taxes | $ (1,149.36) |
| Employee Ben. Other | $ 9,448.10 | | | | Travel & Meals | $ (1,295.55) |
| Employee Ben. Research | $ 1,405.10 | | | | Net Expenses | $ (81,989.79) |
| Employee benefits-Cobra | $ 738.75 | | | | | |
| Equipment Rental | $ 7,115.00 | | | Net before tax and Pers. Ded. | $ (9,222.29) |
| Franchise tax | $ 6,000.00 | | | | Personal | |
| Interest | $ 97.28 | | | | | |
| Janitorial | $ 1,522.35 | | | | | |
| Lab Fees | $ 1,500.08 | | | | | |
| Laundry | $ 1,063.72 | | | | | |
| Liability INS-TCC | $ 4,791.45 | | | | | |
| Maintenance - Equip | $ 4,915.49 | | | | | |
| Medical Supplies | $ 25.42 | | | | | |
| Medical Support Sal. | $ 44,440.97 | | | | | |
| NM State taxes | $ 46.84 | | | | | |
| Office Supplies | $ 1,966.49 | | | | | |
| Office Support Sal. | $ 25,714.28 | | | | | |
| Patient STMTS | $ 1,741.46 | | | | | |
| Payroll taxes | $ 9,504.79 | | | | | |
| Postage and Delivery | $ 1,373.22 | | | | | |
| Rent | $ 25,000.00 | | | | | |
| Research Salaries | $ 9,805.60 | | | | | |
| Telephone | $ 1,188.00 | | | | | |
| Transcription Serv | $ 4,947.15 | | | | | |
| Utilities | $ 1,847.16 | | | | | |
| Less: Nuclear OH | $ (20,823.64) | | | | | |
| Less: Echo, x-ray OH | $ (25,964.30) | | | | | |
| Total | $ 176,595.16 | | | | | |
| Divided Equally | $ 59,865.08 | | | | | |

| JGG - APRIL 2013 | Receipts | Charges | Adjustments | Net A/R | Total A/R | Proc. |
|---|---|---|---|---|---|---|
| | $ 88,589.03 | | | | | |
| Pt. Refunds | | | | | | |
| 1/3 QM | $ 90.69 | | | | | |
| Others | $ 260.34 | | | | | |
| Nuclear Adj Stark | $ 2,058.13 | | | | | |
| Echo, X-ray, Periph Adj | $ 1,046.86 | | | | | |
| Net Receipts | $ 92,045.05 | | | | | |
| | | | | | | |
| Expenses | | | | | | |
| Advertising | $ 45.00 | | | | | |
| Accounting & Legal | $ 14,507.30 | | | | | |
| Ancillary Expense | $ 91,734.49 | | | | | |
| Answering Service | $ 672.59 | | | | | |
| Bank Serv Charges | $ 653.67 | | | | | |
| Bldg & Equip Rep. | $ 395.05 | | | | | |
| Contract Labor | $ 4,914.06 | | | | | |
| Dr. Qaddour | $ 10,000.00 | | | | | |
| Dues & subs | $ 269.10 | | | | | |
| Employee Ben. Other | $ 8,111.04 | | | | | |
| Employee Ben. Research | $ 1,405.10 | | | | | |
| Employee benefits-Cobra | | | | | | |
| Equipment Rental | $ 7,115.00 | | | | | |
| Franchise Tax | $ (6,000.00) | | | | | |
| Interest | $ 98.09 | | | | | |
| Janitorial | $ 1,690.72 | | | | | |
| Laundry | $ 475.98 | | | | | |
| Liability INS-TOC | $ 2,190.45 | | | | | |
| Medical Supplies | $ 1,386.29 | | | | | |
| Medical Support Sal. | $ 39,169.03 | | | | | |
| NM State taxes | $ 12.53 | | | | | |
| Office Support Sal. | $ 25,442.49 | | | | | |
| Patient STMTS | $ 1,854.09 | | | | | |
| Payroll taxes | $ 9,277.99 | | | | | |
| Postage and Delivery | $ 1,391.89 | | | | | |
| Rent | $ 25,000.00 | | | | | |
| Research Salaries | $ 9,805.60 | | | | | |
| Supplies & Research | $ 4,953.71 | | | | | |
| Telephone | $ 1,188.00 | | | | | |
| Training | $ 89.00 | | | | | |
| Transcription Serv | $ 5,739.93 | | | | | |
| Utilities | $ 1,572.59 | | | | | |
| Less: Nuclear OH | $ (39,866.33) | | | | | |
| Less: Echo, x-ray OH | $ (26,043.66) | | | | | |
| Total | $ 187,035.92 | | | | | |
| Divided Equally | $ 66,676.64 | | | | | |

| | | |
|---|---|---|
| Net Receipts | $ | 92,045.05 |
| LESS: | OH Shared Equally | $ (66,676.64) |
| | Nuclear OH | $ (7,312.16) |
| | Echo - X-ray OH | $ (6,846.06) |
| | Personal Employee | $ (12,334.84) |
| | Dues & Subscriptions | $ - |
| | Health Ins | $ (2,070.11) |
| | Cell Phones | $ (558.88) |
| | Payroll Taxes | $ (1,149.36) |
| | Travel & Meals | $ (343.55) |
| | Net Expenses | $ (96,192.42) |

| | | |
|---|---|---|
| Net before tax and Pers. Ded. | $ | (4,147.37) |

TWC 000110
JAMES GRATTAN 001105

273

# TAB 7

Vernon's Texas Statutes and Codes Annotated
    Labor Code (Refs & Annos)
        Title 2. Protection of Laborers
            Subtitle C. Wages
                Chapter 61. Payment of Wages (Refs & Annos)
                    Subchapter B. Payment of Wages

V.T.C.A., Labor Code § 61.018

§ 61.018. Deduction From Wages

[Currentness](#)

An employer may not withhold or divert any part of an employee's wages unless the employer:

(1) is ordered to do so by a court of competent jurisdiction;

(2) is authorized to do so by state or federal law; or

(3) has written authorization from the employee to deduct part of the wages for a lawful purpose.

**Credits**

Acts 1993, 73rd Leg., ch. 269, § 1, eff. Sept. 1, 1993.

Notes of Decisions (4)

V. T. C. A., Labor Code § 61.018, TX LABOR § 61.018
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.